BEATRICE M. JENKINS, *ET AL.*, PETITIONERS-APPEL-
LANTS, v. THE TOWNSHIP OF MORRIS SCHOOL DIS-
TRICT AND BOARD OF EDUCATION, DEFENDANT-RE-
SPONDENT, AND THE TOWN OF MORRISTOWN SCHOOL
DISTRICT AND BOARD OF EDUCATION, DEFENDANT
AND CROSS-PETITIONER-APPELLANT, AND THE BOR-
OUGH OF MORRIS PLAINS BOARD OF EDUCATION, DE-
FENDANT.

Argued April 6 and 26, 1971—Decided June 25, 1971.

484

*Mr. Frank F. Harding* and *Mr. Stephen B. Wiley* argued the cause for the appellants (*Messrs. MacKenzie & Harding,* attorneys for the appellants Beatrice M. Jenkins, et al.; *Mr. Stephen B. Wiley,* attorney for the appellant Morristown Board of Education; *Mr. Donald M. Malehorn* and *Mr. Frank F. Harding,* on the brief).

*Mr. Victor H. Miles* argued the cause for respondent.

*Mr. Paul Bangiola* argued the cause for defendant Borough of Morris Plains Board of Education.

The opinion of the Court was delivered by

JACOBS, J.    The appellants sought to have the Commissioner of Education take suitable steps towards preventing Morris Township from withdrawing its students from Morristown High School and towards effectuating a merger of the Morris Township and Morristown school systems. The Commissioner was of the opinion that, even though such steps were highly desirable from an educational standpoint and to avoid racial imbalance, he lacked legal authority to take them and accordingly he dismissed the individual appellants' petition and the appellant Morristown's cross-petition. The appellants filed notice of appeal to the Appellate Division and we certified before argument there. 58 *N. J.* 1 (1971).

Prior to 1865 Morristown and Morris Township were a single municipal unit. In that year Morristown received permission to incorporate as a separate entity and arbitrary boundary lines were drawn between the Township (Morris) and the Town (Morristown). Despite their official separation, the Town and the Township have remained so interrelated that they may realistically be viewed as a single community, probably a unique one in our State. The Town is

a compact urban municipality of 2.9 square miles and is completely encircled by the Township of 15.7 square miles. The boundary lines between the Town and the Township do not adhere to any natural or physical features but cut indiscriminately across streets and neighborhoods. All of the main roads radiate into the Township from the Green located in the center of the Town and it is impracticable to go from most Township areas to other Township areas without going through the Town itself.

The Town is the social and commercial center of the community whereas the Township is primarily residential with considerable undeveloped area for further residential development. The Town has many retail stores and other commercial establishments surrounding its Green while the Township has only a few retail outlets located on its main roads. The Township has no business center or so-called "downtown" area but the Town's substantial shopping center serves in that aspect for both the Township and the Town. Most of the associations, clubs, social services and welfare organizations serving the residents of both the Town and the Township are located within the Town and, as members of the aforementioned organizations, the Town and Township residents are routinely together at both work and play. The Morristown Green is a common meeting place for young people from both the Town and the Township; day care centers and park and playground facilities in the Town are used by the residents of both the Town and the Township; and little leagues and the like generally involve Town and Township teammates who play on both Town and Township fields.

There is also considerable interdependency in municipal public services. Thus the Town's Water Department supplies water to most of the Township residents; sewer service is rendered by the Town to some parts of the Township; Town and Township Fire and Police Departments regularly assist each other; and the Town and Township jointly operate the Public Library located within the Town. There

are socio-economic and population differences between the Town and the Township but despite these differences the record before us clearly establishes that, as set forth in the Candeub report, the Town and Township "are integrally and uniquely related to one another" and "constitute a single community." The Candeub report was prepared for the Town by an established consulting community planning firm. The hearing examiner, whose findings were adopted and incorporated by the Commissioner of Education in his decision, found that the Morristown-Morris community was essentially as described in the Candeub report; he noted further that the Township did "not dispute the interrelatedness between itself and the Town" though it contended that statutorily and technically the Town and Township are "separate entities for school purposes."

The Township has a population of about 20,000 including less than 5% blacks. The Town has a population of almost 18,000 including about 25% blacks. There was testimony that within this decade the Town's population of blacks would probably increase to between 44% and 48%. Because of employment considerations and other economic factors, black families generally locate in the Town rather than the Township. Town sales of single family homes average between $22,000 and $24,000 whereas the homes in the Township average between $40,000 and $60,000. Though the Town's school population is leveling off, its black school population is increasing steadily. As of 1969 when the hearings were held below, the Town's school enrollment was 2,823 and is not expected to exceed 3,200 by 1980 though its black school population is expected to increase from 39% to over 65% by that time. Its elementary schools are 43% black but are expected to be 70% black by 1980. On the other hand, the Township's public school enrollment of 4,172 will probably reach 6,700 by 1980 and is expected to remain overwhelmingly white. About 5% of the Township students are black and there was testimony that this percentage is likely to decrease rather than increase by 1980.

Most of the Town and Township schools are located near the Town boundary line and the hearing examiner made pointed references and findings to their gross disparities in racial composition. Thus he noted that the Town's Thomas Jefferson School with its 48% black enrollment was "very close to the Township's Woodland School with zero percent black enrollment"; that "geographic proximity" also invited attention to George Washington School (Town, 45%) and Normandy Park School (Township, 9%) and to Lafayette Junior High School (Town, 42%) and Alfred Vail School (Township, 10%); and he poninted out that the Alexander Hamilton School (Town, 35%) was "equidistant" between Sussex Avenue School (Township, 5%) and Hillcrest School (Township, less than 1%).

So far as Morristown High School is concerned, the present black student population is about 14%. But its student body now includes residents of Morris Township and the neighboring municipalities, Borough of Morris Plains and Harding Township. The projections introduced by the Town indicate that if the Morris Township students are withdrawn, the percentage of blacks in Morristown High School will double immediately, and will probably reach 35% by 1980; they indicate further that if the Morris Plains and Harding students are also withdrawn the black enrollment at Morristown High School will probably reach 56% by 1980. The hearing examiner accepted the Town's projections since they appeared to him "essentially reasonable" and no "real projections in contradiction" had been offered.

For over a hundred years the Town and Township have had a sending-receiving relationship under which the Township sends Township students to Morristown High School. There was a short interruption which continued only through 1958 and 1959. As of 1962 the Town and Township executed a formal 10-year sending-receiving contract and the Township has since been regularly sending its 10th, 11th, and 12th grade students to Morristown High School. The contract contains a provision to the effect that after the ten-

year term the parties shall be free to make whatever arrangements they mutually agree upon "subject to the provisions of law and the approval of the Commissioner of Education." Incidentally, the residents of Morris Plains and Harding now at Morristown High School include grade 9 through 12 students who attend under designation without formal contract.*

Morristown High School is an excellent educational institution and offers diversified and comprehensive courses of instruction including seven full vocational programs and an equal number of advanced college placement courses in English, social studies, science and language. It has a total of 150 courses in contrast to the State median of 80–89 courses. It operates with an eight-period day, staggering arrival and departure times. It accommodates 1950 students and by using a nine-period day can accommodate 2450 students; it is anticipated that the High School population will not reach this latter figure until 1974. If the Township is permitted to withdraw its students, Morristown High School will have remaining about 1300 students as of 1974 and if, in addition, Morris Plains and Harding are permitted to change their designation, the High School will then have only about 800 students. The hearing examiner found that "to be left with only Harding and Morris Plains — and especially to be left alone — would impose the following disadvantages:

1. By dint of reduced size alone Morristown High School could not continue to provide the same scope and variety of courses.

*Harding Township was originally a party to the proceedings but was permitted to withdraw by consent. Before the Commissioner, the Borough of Morris Plains sought a regionalization of schools at the high school level and joined in the request to prevent the withdrawal of Morris Township students from Morristown High School. The Borough took no appeal from the Commissioner's determination and before us its counsel simply filed a statement in lieu of brief which joined in the relief sought by the appellants "except that his demands for regionalization would be that of a limited public regional high school for grades nine through twelve."

2. Withdrawal of Township students would mean withdrawal of a significant number of educationally highly-motivated, capable students, and this is likely to have an adverse effect upon the performance and motivation of the remaining Town students.

3. The remaining students would be, as a group, from lower socioeconomic backgrounds and be less oriented toward academic achievement, with the result that the program structure will have to be drastically re-oriented.

4. The percentage of black students in the High School will be approximately as stated above: with Harding and Morris Plains, 27% in 1974 and 35% in 1980; without Harding and Morris Plains, 44% in 1974 and 56% in 1980.

5. Morristown High School will not be able to maintain its place in the scale of excellence in terms of breadth and quality of program.

6. It is probable that, as a consequence, it will have more difficulty in keeping and attracting the same high quality faculty.

7. With the change in program and reputation and the loss in tuition revenue, it is possible that the Town will not be as able or as willing to support financially its school system as it currently is.

8. The Township students will be denied the privilege of an integrated education.

9. The sudden alteration in the racial composition of the High School might aggravate the tendency of potential white buyers to avoid purchasing houses in Morristown.

On the issue of total K–12 merger between the Town and Township, the examiner received considerable testimony during the hearings before him. In the main it most persuasively supported the high educational desirability and economic feasibility of such a merger. The examiner, after pointing to the sharp contrast between the Town's K–12 black enrollment of 39% (projected to over 65% by 1980) and the Township's white enrollment of 95%, stressed that "the close proximity of the Town and Township elementary schools makes the disparity easily visible to and easily felt by the students of the two districts" and that "the community with which Morristown residents, including students, identify extends beyond the bounds of the Town and encompasses the Township." He firmly set forth his view that if there is a failure to merge "the black student population of Morristown — particularly at the elementary school level

— will suffer the same harmful effects that the Commissioner of Education has worked so hard to eliminate within single school districts throughout the State." And though he did not deal with it in explicit terms there is little doubt that he subscribed to the Town's testimony as to the advantages of total merger, set forth as follows in the report submitted to the Town by the Engelhardt educational consulting firm and introduced in evidence at the hearings below:

The advantages to both Morristown and to Morris Township of a K-12 merger may be summarized this way:

1. Establishment of a racial balance which represents the racial composition of the community. Bi-racial experience will be available in the early grades where it has important benefits for both white and Negro students in terms of interracial attitudes and preferences and at the later years where it appears to have important benefits to members of minority groups.
2. Representation of the socio-economic spectrum of the community at all levels of schooling.
3. Equal educational opportunity available to all students without regard to background, race, or residence.
4. Avoidance of invidious comparison between the Morristown High School and a Township school, a comparison ultimately based on race.
5. Avoidance of the deterioration and pejoration of Morristown High School because of racial concentration, loss of reputation, curtailment of program, and ultimate reduction in per-pupil expenditure.
6. Development of a district which represents a natural community and avoidance of the creation and perpetuation of racial imbalance.
7. Development of a climate of education which represents the society in which the students live.
8. Development of a school district and a high school large enough to allow the maximum return on the funds invested and to permit a program broad enough to meet a wide range of pupil needs.
9. Development of an educational pattern related to and serving the single Morristown-Township community.
10. Reduction in the number of school districts in the area from four to three.
11. Development of greater vertical coordination of program and greater flexibility in facilities, curriculum, and organization.

In January 1968 the Township Board of Education conducted a non-binding referendum among the Morris Town-

ship residents. The voters were asked whether they favored a separate K–12 school system for Morris Township or a K–12 merger with Morristown. The vote was 2164 to 1899 in favor of a separate K–12 system. The examiner found that prior to the vote six of the eight members of the Township Board of Education had been on record in favor of some sort of merger; that Board members agreed beforehand to be bound by the results of the referendum; that since the referendum the Board has conducted itself as if the decision were irrevocably made to have a separate school system including a separate high school; and that the Board declined to participate "in a study of regionalization with the other school districts upon the invitation of the County Superintendent of Schools in accordance with the Commissioner's urgent recommendation."

Following the referendum the Township Board of Education set upon a program for the construction of a separate Township high school for Township residents in lieu of the Morristown High School. A bond referendum in connection with the proposed construction was scheduled but was restrained, originally by the Commissioner of Education and later by this Court. In this proceeding the Township Board has pressed for vacation of the restraint and has apparently concentrated all of its efforts towards the building of a new high school in pursuance of the vote at the non-binding referendum. In his decision the Commissioner was highly critical of that referendum and the Board's conduct in connection therewith. Citing *Hackensack Bd. of Education v. Hackensack,* 63 *N. J. Super.* 560 (*App. Div.* 1960), and *Botkin v. Westwood,* 52 *N. J. Super.* 416 (*App. Div.*), *appeal dismissed,* 28 *N. J.* 218 (1958), he described the non-binding referendum as "illegal and an improper abdication of the Township Board's responsibility to perform its function." And he flatly condemned the pre-vote "pledge of all but one" of the Board members to abide by the results of the non-binding referendum, noting that it "improperly delegates the responsiblity for ultimate decision."

The Commissioner was also critical of the Township Board's refusal, since the vote, to consider any alternative to a new high school and its failure to participate in the regionalization study which he had urgently recommended. He expressed his particular concern with "the adverse educational impact of the proposed withdrawal of the Morris Township students from Morristown High School" and with "the long-range harmful effects to the two school systems" in the light of "the growing racial imbalance between the entire student populations of the Town and the Township." And he further expressed his desire to act, within his powers, "so as to forestall the development of what may be another urban-suburban split between black and white students." But having pointedly made that clear, he then proceeded to determine that he had no power, either to prohibit the withdrawal of Township students from Morristown High School, or to direct any steps on the part of the respective Boards towards merger of their school systems, or to grant any other relief towards avoidance of the baneful effects he so soundly envisions. Accordingly he lifted the restraint he had originally granted and dismissed the petition and cross-petition which had been duly filed by the appellants now before us.

The Commissioner's flat disavowal of power despite the compelling circumstances may be sharply contrasted with the sweep of our pertinent constitutional and statutory provisions and the tenor of our earlier judicial holdings. *See N. J. Const.,* art. 1, para. 5; art. 8, sec. 4, para. 1 (1947); *N. J. S. A.* 18A:4–23, 24; *N. J. S. A.* 18A:6–9; *Bd. of Ed. of Elizabeth v. City Coun. of Elizabeth,* 55 *N. J.* 501 (1970); *Bd. of Ed., E. Brunswick Tp. v. Tp. Council, E. Brunswick,* 48 *N. J.* 94 (1966); *Booker v. Board of Education, Plainfield,* 45 *N. J.* 161 (1965); *Morean v. Bd. of Ed. of Montclair,* 42 *N. J.* 237 (1964); *see also In re Masiello,* 25 *N. J.* 590 (1958); *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957); *Schults v. Bd. of Ed. of Teaneck,* 86 *N. J. Super.* 29 (*App. Div.* 1964), *aff'd,* 45 *N. J.* 2 (1965).

Our Constitution contains an explicit mandate for legislative "maintenance and support of a thorough and efficient system of free public schools." Art. 8, sec. 4, para. 1. In fulfillment of the mandate the Legislature has adopted comprehensive enactments which, *inter alia,* delegate the "general supervision and control of public education" in the State to the State Board of Education in the Department of Education. *N. J. S. A.* 18A:4–10. As the chief executive and administrative officer of the Department, the State Commissioner of Education is vested with broad powers including the "supervision of all schools of the state receiving support or aid from state appropriations" and the enforcement of "all rules prescribed by the state board." *N. J. S. A.* 18A:4–23. The Commissioner is authorized to "inquire into and ascertain the thoroughness and efficiency of operation of any of the schools of the public school system of the state" (*N. J. S. A.* 18A:4–24), is directed to instruct county superintendents and superintendents of schools as to "the performance of their duties, the conduct of the schools and the construction and furnishing of schoolhouses" (*N. J. S. A.* 18A:4–29), and is empowered to hear and determine "all controversies and disputes" arising under the school laws or under the rules of the State Board or the Commissioner. *N. J. S. A.* 18A:6–9.

We have from time to time been called upon to reaffirm the breadth of the Commissioner's powers under the State Constitution and the implementing legislation. Thus in *Laba, supra,* 23 *N. J.* 364, we held that the Commissioner's "primary responsibility is to make certain that the terms and policies of the School Laws are being faithfully effectuated" (23 *N. J.* at 382) and he is empowered to remand controversies and disputes "for further inquiry" at the local board level when such course appears appropriate. 23 *N. J.* at 383. In *Masiello, supra,* 25 *N. J.* 590, we rejected a narrow interpretation by the Commissioner as to his powers on review of determinations by the State Board of Examiners and held that his responsibilities entailed independent

factual findings and independent interpretations of State Board rules. 25 *N. J.* at 606–607.

In *East Brunswick, supra,* 48 *N. J.* 94, the voters twice rejected the Township Board of Education's school budget and the Township Council thereupon cut the budget. The Board filed a petition with the Commissioner of Education and we were asked to decide whether the Commissioner had power to determine the controversy between the Board and the Council and power to order restoration of the cut in the budget. We found that he did, pointing out that since as early as 1846 the Legislature had charged the State Commissioner with the duty of obtaining faithful execution of the school laws and that at no time had his "comprehensive statutory responsibility" for deciding all controversies or disputes under the school laws or the State Board's regulations ever been "withdrawn or narrowed." 48 *N. J.* at 101. Referring to the constitutional mandate for the maintenance and support of a thorough and efficient school system (art. 8, sec. 4, para. 1), we noted that the Legislature had directed the local school districts to provide "suitable school facilities and accommodations" (*R. S.* 18:11–1; *N. J. S. A.* 18A:33–1, 2) and had vested the State supervisory agencies "with far reaching powers and duties designed to insure that the facilities and accommodations are being provided and that the constitutional mandate is being discharged." 48 *N. J.* at 103–104. We held that where the Commissioner finds that the budget fixed by the local governing body is insufficient to satisfy educational requirements and standards he should direct local corrective action or fix the budget "on his own." 48 *N. J.* at 107. *See also Bd. of Ed. of Elizabeth v. City Coun. of Elizabeth, supra,* 55 *N. J.* 501.

The history and vigor of our State's policy in favor of a thorough and efficient public school system are matched in its policy against racial discrimination and segregation in the public schools. Since 1881 there has been explicit legislation declaring it unlawful to exclude a child from any public school because of his race (*L.* 1881, *c.* 149; *N. J. S. A.*

18A:38–5.1), and indirect as well as direct efforts to circumvent the legislation have been stricken judicially. See *Pierce v. Union District School Trustees,* 46 *N. J. L.* 76 (*Sup. Ct.* 1884), *aff'd,* 47 *N. J. L.* 348 (*E. & A.* 1885); *Raison v. Bd. of Education, Berkeley,* 103 *N. J. L.* 547 (*Sup. Ct.* 1927); *Patterson v. Board of Education,* 11 *N. J. Misc.* 179 (*Sup. Ct.* 1933), *aff'd,* 112 *N. J. L.* 99 (E. & A. 1934); *Hedgepeth v. Board of Education of Trenton,* 131 *N. J. L.* 153 (*Sup. Ct.* 1944). In 1947 the delegates to the Constitutional Convention took pains to provide, not only in general terms that no person shall be denied any civil right, but also in specific terms that no person shall be segregated in the public schools because of his "religious principles, race, color, ancestry or national origin." Art. 1, para. 5. Implementing legislation now provides that persons shall have the opportunity to obtain "all the accommodations, advantages, facilities, and privileges of any place of public accommodation," including any public school, "without discrimination because of race, creed, color, national origin, ancestry" etc. *N. J. S. A.* 10:5–4, 5(*l*); see Blumrosen, "Antidiscrimination Laws in Action in New Jersey: A Law-Sociology Study," 19 *Rutgers L. Rev.* 189, 257-258 (1965).

In *Booker v. Board of Education, Plainfield, supra,* 45 *N. J.* 161, we sympathetically applied our constitutional and statutory policies towards the elimination of racial segregation or imbalance. Although there was no official policy of segregation there was a concentration of black students in particular schools as the result of what the Commissioner described as " 'a constellation of socio-economic factors.' " 45 *N. J.* at 166. The Commissioner found that this racial concentration or imbalance was educationally undesirable and upheld a corrective plan which satisfied his then stated requirement for the elimination of schools which were " 'completely or almost entirely Negro.' " We held that the Commissioner's requirement was insufficient and that his proper goal was the broader one of "a reasonable plan" for the entire

school system "achieving the greatest dispersal consistent with sound educational values and procedures." 45 *N. J.* at 180.

When the Supreme Court in *Brown v. Board of Education of Topeka,* 347 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954), struck down segregated schools, it recognized that they generate a feeling of racial inferiority and result in a denial of equal educational opportunities to the Negro children who must attend them. However, as we said in *Booker,* while such feeling and denial may appear in intensified form when segregation represents official policy, "they also appear when segregation in fact, though not official policy, results from long standing housing and economic discrimination and the rigid application of neighborhood school districting." 45 *N. J.* at 168. *Brown* itself did not deal with the latter or *de facto* type of segregation and the very recent Supreme Court decisions in sweeping furtherance of *Brown* may fairly be viewed as confined to situations where there had been *de jure* segregation through dual public school systems. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 *U. S.* 1, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554 (1971); *Davis v. Board of School Commrs.,* 402 *U. S.* 33, 91 S. Ct. 1289, 28 *L. Ed.* 2d 577 (1971); *McDaniel v. Barresi,* 402 *U. S.* 39, 91 *S. Ct.* 1287, 28 *L. Ed.* 2d 582 (1971); *North Carolina Bd. of Ed. v. Swann,* 402 *U. S.* 43, 91 *S. Ct.* 1284, 28 *L. Ed.* 2d 586 (1971). But in *Booker* we did cite several lower federal court decisions which had taken the position that in the circumstances presented to them the continuance of *de facto* segregation in the local public schools would violate the federal constitution. 45 *N. J.* at 169-170. *See United States v. Jefferson County Board of Education,* 372 *F.* 2d 836, 873-876 (5 *Cir.* 1966), *s. c.,* 380 *F.* 2d 385 (5 *Cir*), *cert. denied,* 389 *U. S.* 840, 88 *S. Ct.* 67, 19 *L. Ed.* 2d 103 (1967); *Hobson v. Hansen,* 269 *F. Supp.* 401, 503-511 *(D. D. C.* 1967), aff'd, *Smuck v. Hobson,* 132 *U. S. App. D. C.* 372, 408 *F.* 2d 175 (1969); *cf. Davis v. School District of Pontiac, Inc.* 309 *F. Supp.* 734 *(E. D. Mich.* 1970), *aff'd,* 443 *F.* 2d 573 (6 *Cir.* 1971).

In *Lee v. Nyquist,* 318 *F. Supp.* 710 (*W. D. N. Y.* 1970), the New York Commissioner of Education had undertaken broad steps towards elimination of *de facto* segregation in the public schools. The New York Legislature sought to curb these by enacting a statute which prohibited the implementation of plans designed to alleviate racial imbalance in the schools except with the approval of "a local elected board." 318 *F. Supp.* at 718. The three-judge district court struck this statute as invidious and unconstitutional discrimination. In the course of his opinion, Judge Hays pointed out that although there may be no general duty under the federal constitution to undo *de facto* segregation, "it is by now well documented and widely recognized by educational authorities that the elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black and white" (318 F. Supp. at 714); and he approvingly quoted the following from a recent policy statement by the Regents of the University of the State of New York:

"[T]he elimination of racial segregation in the schools can enhance the academic achievement of non-white children while maintaining achievement of white children and can effect positive changes in interracial understanding for all children. The latter consideration is paramount. If children of different races and economic and social groups have no opportunity to know each other and to live together in school, they cannot be expected to gain the understanding and mutual respect necessary for the cohesion of our society. The stability of our social order depends, in large measure, on the understanding and respect which is derived from a common educational experience among diverse racial, social, and economic groups — integrated education. The attainment of integrated education is dependent upon the elimination of racial segregation in the schools." 318 *F. Supp.* at 714.

The judgment in *Lee v. Nyquist* was summarily affirmed by the Supreme Court without opinion. 402 *U. S.* 935, 91 *S. Ct.* 1618, 29 *L. Ed.* 2d 105 (May 4, 1971).

Views along the lines found in *Lee v. Nyquist* were expressed by this Court in *Booker.* We there noted that whether

or not the federal constitution compels action to eliminate or reduce *de facto* segregation in the public schools, it does not preclude such action by state school authorities in furtherance of state law and state educational policies. *See Morean v. Bd. of Ed. of Montclair, supra,* 42 *N. J.* at 242-44; *cf. Schults v. Bd. of Ed. of Teaneck, supra,* 86 *N. J. Super.* 29. We pointed out in *Booker* that "in a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority. It may well be, as has been suggested, that when current attacks against housing and economic discriminations bear fruition, strict neighborhood school districting will present no problem. But in the meantime the states may not justly deprive the oncoming generation of the educational advantages which are its due, and indeed, as a nation, we cannot afford standing by." 45 *N. J.* at 170-171.

It is true that *Booker* dealt with a community which was wholly contained within a single district fixed by municipal lines whereas here the community involves two districts. When dealing with *de jure* segregation the crossing of district lines has of course presented no barrier whatever. In *Haney v. County Board of Education of Sevier County, Ark.,* 410 *F.* 2d 920 (8 *Cir.* 1969), *s. c.,* 429 *F.* 2d 364 (8 *Cir.* 1970), the court of appeals flatly rejected a district court's notion that consolidation to eliminate segregation in the public schools may not be achieved without the voter approval contemplated by state law. In the course of his opinion,

Judge Lay noted that "state political subdivisions have long ago lost their mastery over the more desired effect of protecting the equal rights of all citizens" (410 *F.* 2d at 924); he pointed out that political subdivisions of the state are "mere lines of convenience for exercising divided governmental responsibilities" and "cannot serve to deny federal rights" (410 *F.* 2d at 925); he stressed that equal protection rights do not depend on the votes of the majority (410 *F.* 2d at 925); and in response to those who still persist in their opposition to integration, he had this to say:

Separatism of either white or black children in public schools thrives only upon continued mistrust of one race by another. It reflects a continuum of the fallacious "separate but equal" doctrine, which the law now acknowledges serves only as a sleeping sickness, whether it be engendered by the white or black. Separatism is just as offensive to the law when fostered by the Negro community as when the white community encourages it. Perpetuation of a bi-racial school system moves only toward further intolerances and misunderstandings. The law can never afford to bend in this direction again. The Constitution of the United States recognizes that *every* individual, white or black, is considered equal before the law. 410 *F.* 2d at 926.

As the Supreme Court pointed out in *Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506, 535 (1964), political subdivisions of the states whether they be "counties, cities or whatever" are not "sovereign entities" and may readily be bridged when necessary to vindicate federal constitutional rights and policies. *See Gomillion v. Lightfoot,* 364 *U. S.* 339, 347, 81 *S. Ct.* 125, 5 *L. Ed.* 2d 110, 116 (1960); *United States v. State of Texas,* 321 *F. Supp.* 1043, 1050–1058 (*E. D. Texas* 1970); *cf. Jackman, et al. v. Bodine, et al.,* 55 *N. J.* 371 (1970). It seems clear to us that, similarly, governmental subdivisions of the state may readily be bridged when necessary to vindicate state constitutional rights and policies. This does not entail any general departure from the historic home rule principles and practices in our State in the field of education or elsewhere; but it does entail suitable measures of power in our

State authorities for fulfillment of the educational and racial policies embodied in our State Constitution and in its implementing legislation. Surely if those policies and the views firmly expressed by this Court in *Booker* (45 *N. J.* 161) and now reaffirmed are to be at all meaningful, the State Commissioner must have power to cross district lines to avoid "segregation in fact" (*Booker,* 45 *N. J.* at 168), at least where, as here, there are no impracticalities and the concern is not with multiple communities but with a single community without visible or factually significant internal boundary separations.

In addition to the broad general grants of supervisory powers to the Commissioner, typified by statutes such as *N. J. S. A.* 18A :4–23 and *N. J. S. A.* 18A :6–9, there are legislative enactments which specifically call for crossing of district lines. *See N. J. S. A.* 18A :38–8 *et seq.; Blumrosen, supra,* 19 *Rutgers L. Rev.* at 266–69. Among these are the provisions which relate explicitly to sending-receiving situations such as the one now in existence between Morris Township and Morristown ; as we have already noted, that relationship under which the Township sends Township students to Morristown High School has, apart from a two-year interruption in 1958 and 1959, continued for over a hundred years. *N. J. S. A.* 18A :38–11 provides that a board of education in a district lacking high school facilities shall designate a high school outside its district for attendance by its high school students; and *N. J. S. A.* 18A :38–13 provides, in pertinent part, that no such designation "shall be changed or withdrawn" except for "good and sufficient reason upon application made to and approved by the commissioner."

Antecedents of *N. J. S. A.* 18A :38–11 and 13 were in force before the Legislature adopted *L.* 1953, *c.* 273 — now *N. J. S. A.* 18A :38–20 *et seq.* That statute provides that when a board of education of a receiving district is furnishing high school education to students from a sending district and additional facilities are required, the receiving district may, as a condition to providing the additional facilities,

enter into a contract for a term not exceeding ten years under which the receiving district agrees to provide the education and the sending district agrees not to withdraw its students except as provided in paragraph two of the statute. *N. J. S. A.* 18A:38–20. That paragraph sets forth that any receiving district may apply to the Commissioner for consent to terminate the contract on the ground that it is no longer able to provide the necessary facilities, and any sending district may apply to the Commissioner for permission to withdraw its students and provide its own high school facilities on the ground that the receiving district is not providing suitable facilities or that the receiving district will not be seriously affected educationally or financially by the withdrawal. *N. J. S. A.* 18A:38–21.

Apparently the 1953 enactment was intended to give additional assurance to the receiving district furnishing additional facilities that it would not be endangered during the ten-year contract period. But the enactment was not in anywise intended to repeal nor did it have the effect of repealing the preexisting statutes such as that now embodied in *N. J. S. A.* 18A:38–13. Thus when the 1962 contract expires or is terminated in accordance with its terms, the Township's prior designation of Morristown High School continues in full effect until it is changed or withdrawn in strict accordance with *N. J. S. A.* 18A:38–13. That statute appeared in the 1937 Revision as part of *R. S.* 18:14–7. At that time it made no specific reference to withdrawal but did provide that no change of designation could be made except for good and sufficient reason and subject to the approval of the Commissioner. In 1956 *R. S.* 18:14–7 was amended to provide that the designation shall not be "changed or withdrawn" unless good and sufficient reason exists for the change and subject to the approval of the Commissioner. *L. 1956, c.* 68. In the 1968 Revision of the Education Law (*L. 1967, c.* 271) the pertinent statutory language was put into its current form which explicitly provides, as set forth earlier, that the designation shall not be "changed or with-

drawn" except for "good and sufficient reason upon application made to and approved by the commissioner." *N. J. S. A.* 18A:38–13.

■ Despite the cited broadening and sweep of the statutory terms, the Commissioner expressed the view that he had no power whatever under *N. J. S. A.* 18A:38–13 to prevent the withdrawal of the Morris Township students from the Morristown High School. He cited earlier administrative rulings in which his predecessors had taken the position that "once a school district provides its own high school facilities" *R. S.* 18:14–7 is inapplicable. They in turn had relied on language in *R. S.* 18:14–7 to the effect that any district which "lacks or shall lack high school facilities" may designate a high school outside its district for its high school students. In the present statute (*N. J. S. A.* 18A:38–11) the reference to "shall lack" is omitted and the provision now is that every district "which lacks high school facilities" shall designate a high school in another district for its high school students. Morris Township still comes within the literal terms of the statute but, more important, is our present disapproval of the administrative holding that the unilateral determination by Morris Township to build its own high school (*cf. N. J. S. A.* 18A:45–1) has the legal effect of nullifying the precise statutory requirement (*N. J. S. A.* 18A:38–13) under which ultimate withdrawal of its high school students from Morristown High School may not be accomplished without a prior showing to the Commissioner of good and sufficient reason and express approval on his part.

Surely on examination of the statutory terms themselves there is nothing in *N. J. S. A.* 18A:38–13 to support the Commissioner's restrictive construction. Nor have we found anything legislatively or judicially sustaining his suggestion that the history of the sending-receiving statute reveals "the total vulnerability of a receiving district upon the decision of a sending district to erect its own facilities and educate its pupils itself." While the earlier administrative rulings

had that effect, they simply constituted the narrowing of a broad legislative provision in a manner comparable with other administrative self-limiting approaches which we have repeatedly rejected. *Cf. Bd. of Ed., E. Brunswick Tp. v. Tp. Council, E. Brunswick, supra,* 48 *N. J.* 94; *Booker v. Board of Education, Plainfield, supra,* 45 *N. J.* 161; *In re Masiello, supra,* 25 *N. J.* 590; *Laba v. Newark Board of Education, supra,* 23 *N. J.* 364. The Commissioner has been appropriately charged with high responsibilities in the educational field and if he is faithfully to discharge them in furtherance of the State's enlightened policies he must have corresponding powers. The Legislature has here granted them in broad terms and it would disserve the interests of the State to permit their administrative narrowing which in effect represents not only a disavowal of power but also a disavowal of responsibility.

In view of all of the foregoing, it is evident that the Commissioner erred in dismissing, for lack of power under *N. J. S. A.* 18A:38–13, the appellants' petition and cross-petition that he take suitable steps towards preventing Morris Township from withdrawing its students from Morristown High School. We come now to consideration of his dismissal of their further petition that he take suitable steps towards effectuating a merger of the Morris Township and Morristown school systems. Here again the dismissal was rested on lack of power, the Commissioner having concluded that the State constitutional provisions (art. 1, para. 5; art. 8, sec. 4, para. 1) and his comprehensive general statutory powers were insufficient to enable him to deal with the situation. *See N. J. S. A.* 18A:4–22, 23, 24, 25, 29; *N. J. S. A.* 18A:6–9; *N. J. S. A.* 18A:55–2; *cf. N. J. S. A.* 18A:4–10, 15, 16; *N. J. S. A.* 18A:45–1.

In reaching his conclusion the Commissioner stressed that while the Legislature had made specific provision for the merger of local districts into regional districts with voter approval (*N. J. S. A.* 18A:13–34), it had not made specific provision for any "alternative method." He ex-

pressed the view that the legislative grant to him of "broad supervisory powers" did not enable him to act without the stated requirements such as voter approval though this approach may be contrasted with *East Brunswick, supra,* 48 *N. J.* 94, where we recently upheld the Commissioner's power to reinstate a local school budget rejected by the local voters. For present purposes we need not pursue the issue in its broader aspects for the situation here is indeed a specially compelling one and in traditional judicial fashion our holding may be confined to it. As has already been pointed out, here we are realistically confronted not with multiple communities but with a single community having no visible or factually significant internal boundary separations, and with a record which overwhelmingly points educationally towards a single regional district rather than separate local districts.

The projections leave little room for doubt as to the unfortunate future if suitable action is not taken in timely fashion. The Commissioner explicitly referred to the growing racial imbalance between the Town and the Township and to its long-range harmful effects on the school systems of both; and he recognized that unless forestalled there would be another urban-suburban split between black and white students. Unlike other areas in the State, the split can readily be avoided without any practical upheavals; indeed the record indicates not only that merger would be entirely "reasonable, feasible and workable" (*Swann v. Charlotte-Mecklenburg Bd. of Ed., supra,* 401 *U. S.* at 31, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d at 575) but also that it would not significantly involve increased bussing or increased expenditures since most of the schools within the Town and the Township are located near their boundary line. So far as the educational advantages of merger are concerned, the testimony most persuasively indicates that they will redound to the benefit of the students from the Township as well as the Town; such minor dissent as appears in the testimony is in flat conflict with the educational views firmly held by the

Commissioner and with the judicial views expressed by this Court in *Booker* (45 *N. J.* 161).

In the course of his decision, the Commissioner recognized that, as a matter of State policy and apart from federal dictates, there is an "obligation to take affirmative steps to eliminate racial imbalance, regardless of its causes." Citing our constitutional provisions for a thorough and efficient school system (art. 8, sec. 4, para. 1) and against segregation in the schools (art. 1, para. 5), he noted: "it may well be that, given the racial disparity between the school populations in Morristown and Morris Township and given the disparity in socio-economic makeup of the two communities and the resultant difference in capacity to provide quality education programs, the Legislature has not fulfilled its constitutional obligation to provide for a thorough and efficient system of public schools." But it seems to us that rather than suggesting an intolerable legislative default, he could and should more reasonably and suitably have found, as we did in *Booker, supra,* 45 *N. J.* at 173-181, faithful legislative fulfillment of the constitutional mandate in the many broad implementing enactments delegating comprehensive powers to the Commissioner.

In *Booker* we held that the Commissioner had the responsibility and power of correcting *de facto* segregation or imbalance which is frustrating our State constitutional goals; we pointed out that where the Commissioner determines that the local officials are not taking reasonably feasible steps towards the adoption of a suitable desegregation plan in fulfillment of the State's policies, he may either call for a further plan by the local officials or "prescribe a plan of his own." 45 *N. J.* at 178. There was no specific statutory language to that effect but we found sufficient legislative authority in the various general statutes which have been adopted by the Legislature from time to time and are now embodied in the 1968 Revision of the Education Law (*L.* 1967, *c.* 271). In particular, we referred to the Commissioner's long standing and comprehensive power under *N. J.*

*S. A.* 18A:6–9, pertinent here, to decide all controversies under the school laws or under the rules of the State Board of Education or the Commissioner (45 *N. J.* at 175), and we cited Blumrosen, *supra,* 19 *Rutgers L. Rev.* at 261 where many other pertinent powers of the Commissioner are enumerated. These include, as set forth earlier in this opinion, many broad supervisory powers designed to enable him, with the approval of the State Board of Education, to take necessary and appropriate steps for fulfillment of the State's educational and desegregation policies in the public schools. *Booker, supra,* 45 *N. J.* at 173-181; *N. J. S. A.* 18A:4–22, 23, 24, 25, 29.

The Commissioner has been expressly vested with power to withhold State aid from any school district which fails "to obey the law or the rules or directions of the state board or the commissioner." *N. J. S. A.* 18A:55–2; *cf. N. J. S. A.* 18A:58–16. Similarly he has been expressly vested with power to withhold State aid from any school district which fails to provide "suitable educational facilities" including proper buildings and equipment, convenience of access and courses of study. *N. J. S. A.* 18A:33–1, 2; *cf. N. J. S. A.* 18A:11–1. On a broad interpretation, schools with feasibly correctable racial imbalances might well currently be viewed as not affording suitable educational facilities within the meaning of the statutory language. *Cf.* Blumrosen, *supra,* 19 *Rutgers L. Rev.* at 259 n. 155. In any event, it may be noted that the Commissioner acted with unusual hesitancy when he merely recommended the study of regionalization in which the Township Board declined to participate; he could readily have directed its participation with the ample strength of an arsenal of powers including, *inter alia,* the power to withhold State aid (*N. J. S. A.* 18A:55–2) and the power to withhold approval of school construction. *N. J. S. A.* 18A:45–1; *N. J. S. A.* 18A:18–2.

The Commissioner's criticism of the Township Board's conduct in connection with the non-binding referendum was well taken. Apart from whether Board members had the

right to seek a non-binding referendum at all (*compare Botkin v. Westwood, supra,* 52 *N. J. Super.* 416 *with Gamrin v. Mayor and Council of Englewood,* 76 *N. J. Super.* 555 (*Law Div.* 1962)) they clearly had no right to pledge themselves in advance to abandon their individual affirmative views in favor of the majority negative vote. *Cf. Cullum v. Bd. of Education of Tp. of North Bergen,* 15 *N. J.* 285 (1954). The vote was taken without the benefit of a suitable regionalization study on the part of the Township Board and without full and fair presentation to the voters of material considerations such as projected capital cost savings to Township taxpayers, etc. It has been suggested that it was motivated by constitutionally impermissible racial opposition to merger (*cf. Lee v. Nyquist, supra,* 318 *F. Supp.* 710; *West Morris Regional Board of Education v. Sills,* 58 *N. J.* 464 (1971)) but we pass that by since the Commissioner made no finding to that effect and his powers were of course in nowise dependent on any such finding.

In the light of all that has been said earlier in this opinion, we now find that the Commissioner erred not only in the dismissal of the appellants' petition and cross-petition insofar as they related to withdrawal of Township students from Morristown High School but also insofar as they related to merger of the Morris Township and Morristown school systems. The Commissioner is adequately empowered to entertain such further proceedings pursuant to the petition and cross-petition as he finds appropriate and to grant such prayers therein as he considers warranted including (1) direction for continuance of the sending-receiving relationship after the expiration of the present contract and (2) direction that the Boards of the Township and Town proceed with suitable steps towards regionalization, reserving, however, supervisory jurisdiction to the Commissioner with full power to direct a merger on his own if he finds such course ultimately necessary for fulfillment of the State's educational and desegregation policies in the public schools.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.