831 A.2d 555 (2003)
363 N.J. Super. 130
In the Matter of the Petition for Authorization to Conduct a Referendum on the Withdrawal of NORTH HALEDON SCHOOL DISTRICT from the Passaic County Manchester Regional High School District.
North Haledon Board of Education and Borough of North Haledon, Plaintiffs-Respondents,
v.
Passaic County Manchester Regional High School District, Defendant-Appellant, and
Ronni Nochimson, Passaic County Clerk; William Librera, Commissioner of Education; and Maria Nuccetelli, Passaic County Superintendent of Schools, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2003.
Decided May 15, 2003.
Rodney T. Hara, Fairlawn, argued the cause for appellant Passaic County Manchester Regional High School District (A-3582-01 & A-270-02) (Fogarty & Hara, attorneys; Mr. Hara, of counsel and on the briefs; Janet L. Parmelee on the brief (A-270-02)).
Allan P. Dzwilewski, Florham Park, argued the cause for appellant Haledon Board of Education (A-3597-01), Borough of Haledon, Prospect Park Board of Education, Borough of Prospect Park (Schwartz, Simon, Edelstein, Celso & Kessler, attorneys; Mr. Dzwilewski, on the brief).
Vito A. Gagliardi, Jr., Morristown, argued the cause for respondent Borough of North Haledon and North Haledon Board of Education (A-3582-01, A-3597-01 & A-270-02) (Porzio, Bromberg & Newman, attorneys; Mr. Gagliardi, of counsel and on the brief with Thomas O. Johnston).
David Samson, Attorney General, attorney for respondent Board of Review (A-3582-01T5 and A-3597-01T5) (Allison Colsey Eck, Deputy Attorney General, on the statement in lieu of brief).
Allison Colsey Eck, Deputy Attorney General, argued the cause for respondents William Librera, Commissioner of Education; and Maria Nuccetelli, Passaic County Superintendent of Schools (A-270-02) (David Samson, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Eck, on the brief).
Michael H. Glovin, Assistant Passaic County Counsel, filed a letter of non-participation *556 on behalf of Ronni Nochimson, Passaic County Clerk (A-270-02).
Before Judges SKILLMAN, CUFF and WINKELSTEIN.
The opinion of the court was delivered by CUFF, J.A.D.
The Borough of North Haledon seeks to withdraw from the limited purpose regional high school district of which it is a member. The school is currently racially and ethnically diverse. In order to withdraw, North Haledon was required to obtain permission from a board of review to submit the question of its withdrawal to the voters of the regional high school district. The Board of Review appointed to review North Haledon's petition authorized the submission of the question to the voters, and the referendum obtained a sufficient number of votes to allow North Haledon to withdraw from the regional district.
The decision by the Board of Review and the referendum question presented to the voters present two questions for our consideration. First, we must decide whether the withdrawal of North Haledon, which will immediately cause a 9% decrease of the white population and will lead to a racial and ethnic imbalance in the school within a short time, is a negative impact on the education offered by the regional district which bars submission of the question to the voters of the regional district. Second, we examine whether the question and interpretive statement presented to the voters at the referendum fairly express the purpose of the matter which is the subject of the referendum.
We consolidated the appeals of the Passaic County Manchester Regional High School District, Haledon Board of Education, the Borough of Haledon, Prospect Park Board of Education, and the Borough of Prospect Park which challenge the decision by the Board of Review to allow a vote on the question of the withdrawal of the Borough of North Haledon and the North Haledon School District from the Passaic County Manchester Regional High School District. We now also consolidate the appeal, A-270-02T5, of the regional high school district from an order of the Law Division settling the terms of the referendum question.
We address first the decision by the Board of Review to allow the question of North Haledon's withdrawal from the limited purpose regional high school district to be presented to the residents of each district. The Board of Review found that the loss of North Haledon students might cause the elimination of some courses and teaching staff, but the district would still have a sufficient number of students to provide a thorough and efficient education. The Board found that white students comprise 57%[1] of the student population and predicted that the removal of North Haledon students would result in a 9% drop in the white population of the high school. The Board opined that this loss would have a negligible impact on the school. We conclude that a 9% decrease in the white population of the high school cannot be considered a negligible impact on the education program and reverse.
In 1957, the municipalities of North Haledon, Haledon and Prospect Park formed a limited purpose regional high school district. The district, known as Passaic County Manchester Regional High School *557 District, provides secondary education for students from the constituent school districts. The regional high school district operates one school which is located on a 24.53 acre campus in Haledon. The school districts of North Haledon, Haledon and Prospect Park operate independent pre-K through 8 schools.
Over the years, particularly during the 1990s and to the present time, residents of North Haledon became increasingly displeased about the financial burden they bore to support the regional high school district. When the regional high school district was formed in 1957, the district's capital and debt service tax levies were apportioned among the constituent districts based upon property tax ratables; the operational costs were apportioned based on enrollment from the constituent districts. In the mid-1970s, the school tax for all costs was changed to an apportionment based upon the equalized value of real estate in each constituent district. N.J.S.A. 18A:13-23. Over the years, North Haledon has paid an increasingly disproportionate share, on a per pupil basis, of the cost relative to the other constituent districts. For example, in the 2001-02 school year, Prospect Park paid $3,400 per pupil to educate its high school students; Haledon paid $5,300 per pupil; and North Haledon paid $18,400. Historically, North Haledon students comprise approximately 20% of the school population.
In 1995, North Haledon proposed a referendum to alter the method of apportionment of the tax levy from that of equalized value of real property to that of per pupil enrollment. The question was defeated. North Haledon initiated litigation to revise the apportionment of costs; it was unsuccessful. The regional high school district budget has been defeated on two occasions in the last five years, 1997-98 and 2001-02; the residents of North Haledon have been responsible each year for the defeat of the budget.
In 1998, North Haledon formed an ad hoc committee to analyze alternatives available to it to address its concerns about the cost of secondary education for its residents. These efforts led to the retention of experts and the preparation of a feasibility report (the Beineman/Kirtland Report) and a request by the Borough of North Haledon to the Passaic County Superintendent of Schools to conduct an investigation of the advisability of withdrawal of North Haledon from the regional high school district.
On October 15, 2001, the county superintendent issued her report. She opined that the regional high school district could still offer a thorough and efficient education if North Haledon withdrew but observed that there would be some impact on the educational program and extracurricular and co-curricular activities. For example, North Haledon students comprise on average 31% of the enrollment in Advanced Placement and Honors courses. Sixty percent of North Haledon seniors participate in athletics and extracurricular clubs and activities. Thirty-three percent of the girls soccer team is comprised of North Haledon students. Therefore, the county superintendent expressed concern that, if North Haledon was allowed to withdraw from the district, classes with low enrollments may not be continued, the same level of courses may not be continued, and some athletic teams may be discontinued.
The county superintendent opined that there would be some financial savings, such as transportation, textbooks, salaries and out-of-district tuition, experienced as a result of the withdrawal of North Haledon students. She also predicted that State school aid would increase but not enough to offset the revenue lost due to a withdrawal *558 by North Haledon. Therefore, the tax levy for the remaining districts, Haledon and Prospect Park, would rise. Furthermore, the borrowing capacity of the regional high school district would be reduced from $30,000,000 to just under $15,000,000.
The county superintendent noted that the racial and ethnic diversity of the regional high school would be negatively affected. The white student population in the high school would decrease 9% by the withdrawal of students from North Haledon, almost all of whom are white. She noted that demographic changes within Haledon and Prospect Park indicated a growing proportion of non-white students. The withdrawal of the North Haledon students would exacerbate the racial and ethnic diversity imbalance of the school.
The county superintendent also identified several advantages if North Haledon withdrew from the regional high school district. She observed that high school administrators could focus on the needs of students from two rather than three municipalities. Furthermore, she anticipated that class sizes may be smaller, additional space in the high school may allow for greater flexibility in scheduling and programming, and North Haledon taxpayers may save money due to lower school taxes. However, the county superintendent concluded that the disadvantages to withdrawal outweighed the advantages.
Following an affirmative vote by the Board of Education of the Borough of North Haledon and the governing body of the Borough of North Haledon, a petition was filed on November 8, 2001 with the State Commissioner of Education to appoint a board of review to evaluate its request to withdraw from the regional high school district. The petition was opposed by the regional high school district and the governing bodies and school boards of Prospect Park and Haledon.
The Board of Review convened and conducted two public hearings. During the course of the Board of Review's consideration of the petition, North Haledon reached an agreement with the Board of Education of Midland Park to receive its high school students. According to the agreement, North Haledon will establish a sending-receiving relationship with Midland Park. North Haledon will pay $8250 annually for each of its students enrolled at Midland Park. North Haledon also emphasized that it proposed to terminate its participation in the regional high school district on a date certain but withdraw its students over a three-year period. Thus, for the 2003-04 school year, the ninth grade students from North Haledon will enroll in Midland Park while the tenth, eleventh and twelfth grade students will remain at the regional high school on a tuition basis.
On January 29, 2002, the Commissioner of Education, as chair of the Board of Review, requested the county superintendent to provide the Board with written clarification regarding the proposed three-year phase out of the North Haledon students with specific reference to the following issues: racial/ethnic diversity, finances, staffing levels, and state aid. He also requested information on the ability of Midland Park to absorb the North Haledon students.
Following the receipt of this information, the Board of Review advised by a letter dated February 8, 2002, that it voted unanimously to grant the petition and authorized the county superintendent to conduct a referendum on the question of withdrawal. On April 5, 2002, the Board of Review issued an amplification of its decision. The Board noted that it reviewed the Beineman/Kirtland feasibility study *559 submitted by North Haledon, various data submitted by the regional high school district, the report of the county superintendent and a report by Vincent B. Calabrese and Mel Wyns submitted by the Haledon Board of Education and the Borough of Prospect Park. Addressing the statutory criteria, N.J.S.A. 18A:13-56, the Board found that the minimal debt obligation of the regional district, $92,000 as of June 30, 2000, would not be a burden to the remaining constituent districts. It found that withdrawal would reduce the number of students, which would potentially cause the elimination of some classes and some teachers, but the regional high school district would have a sufficient number of students and space to provide a thorough and efficient education. Finally, it found that the withdrawal of the North Haledon students would result in a 9% drop in the white population at the school, but, in the Board's view, this was a negligible impact on the racial composition of the student body.
The referendum was scheduled for September 24, 2002. The regional high school district board of education drafted the referendum question and interpretive statement and submitted it to the County Clerk. North Haledon simultaneously filed a complaint in the Law Division and a petition with the Commissioner to revise the referendum and interpretive statement. Judge McVeigh requested the Commissioner to take jurisdiction of the issue and review and revise, if necessary, the referendum question and interpretive statement. The Commissioner accepted jurisdiction and revised the language of the referendum question and the interpretive statement, and Judge McVeigh ordered the referendum to proceed on September 24, 2002. North Haledon prevailed in the referendum. The Commissioner has established July 1, 2003, as the effective date of the withdrawal.
It is from the decision of the Board of Review that the governing bodies and the school boards of Prospect Park and Haledon, as well as the regional high school district, appeal. The regional high school district argues that the findings by the Board of Review are not supported by the evidence, the Board failed to properly consider the statutory factors, the negative impact on the racial/ethnic diversity of the school precluded authorization of a vote, and the Board relied on financial assumptions which were speculative and not supported by law. The governing bodies and school boards of Prospect Park and Haledon also contend that the petition was deficient because no second appraisal was provided, the amount of indebtedness has not been determined, and the Board failed to address the long-range buildings and grounds needs of the district. They, too, argue that the Board's finding concerning the impact on the racial and ethnic diversity of the high school is erroneous.
A board of review is chaired by the Commissioner of Education. N.J.S.A. 18A:13-56. A board also includes a member of the State Board of Education, the State Treasurer or a designee, and the Director of the Division of Local Government Services in the Department of Community Affairs. Ibid. A board of review must consider the effect of the proposed withdrawal on the remaining districts. Ibid. The Legislature has prescribed that:
In considering the effect of the proposed withdrawal ... upon the educational and financial condition of the withdrawing and remaining districts, or upon each of the constituent districts in event of a dissolution, the board of review shall:
a. Consent to the granting of the application; or
b. Oppose the same because, if the same be granted

*560 1. An excessive debt burden will be imposed upon the remaining districts, or the withdrawing district, or upon any of the constituent districts in the event of a dissolution;
2. An efficient school system cannot be maintained in the remaining districts or the withdrawing district, ...;
3. Insufficient pupils will be left ... to maintain a properly graded school system; or
4. Any other reason, which it may deem to be sufficient;

[Ibid.]
Facts which establish any of the statutory criteria to refuse permission to withdraw are incompatible with the constitutional guarantee of a thorough and efficient education and dictate denial of the petition. In re Petition for Authorization to Conduct a Referendum on the Dissolution of Union County Reg'l High Sch. Dist. No. 1, 298 N.J.Super. 1, 7-8, 688 A.2d 1082 (App. Div.), certif. denied, 149 N.J. 37, 692 A.2d 50 (1997).
We have held that the "any other reason" ground must be of the same character as the other three factors, as each factor implicates the State's constitutional obligation for the maintenance of a "`thorough and efficient system of free public schools.'" Id. at 8, 688 A.2d 1082 (quoting N.J.Const. art. VIII, § 4, ¶ 1). "Any less weighty reason would be an inadequate ground for compelling constituent local school districts and municipalities to preserve a regional school district against the will of a majority of the voters in a majority of its local districts." Ibid. This court has recognized that racial/ethnic balance within a regional high school district is a statutory criteria which must be considered in the evaluation of a petition to dissolve a regional school district. Id. at 7-8, 688 A.2d 1082.
The Board of Review found that the high school was currently racially diverse. As of October 2001, the racial percentages, as reported by the district and published by the State Department of Education, were 51.01% white, 7.59% black, 36.36% Hispanic, and 5.06% Asian/Pacific Islander. The Board of Review found that the withdrawal of North Haledon students will result in a 9% drop in the white population. It also found that the percentage of minorities will continue to rise and the white population will continue to decline due to population trends in the constituent towns. Nevertheless, the Board of Review found the 9% loss of white students would have a negligible impact on the racial composition of the regional high school district. This finding is out of step with the recognized public policy of this State which seeks to promote equal educational opportunity and to avoid the adverse effects of racial and ethnic imbalance in schools, and which requires education policy makers to anticipate imbalance and to take action to blunt perceived demographic trends which will lead to racial or ethnic imbalance.
The courts of this State have long recognized that racial and ethnic segregation in the schools operated by a school district contravenes and frustrates the constitutional imperative of a thorough and efficient education. Jenkins v. Township of Morris Sch. Dist., 58 N.J. 483, 494-97, 279 A.2d 619 (1971); Booker v. Bd. of Educ. of Plainfield, 45 N.J. 161, 173-81, 212 A.2d 1 (1965); Morean v. Bd. of Educ. of Montclair, 42 N.J. 237, 242-44, 200 A.2d 97 (1964); Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J.Super. 413, 452-55, 608 A.2d 914 (App.Div. 1992), aff'd o.b., 132 N.J. 327, 625 A.2d 483 (1993).
In Booker, supra, the Court examined the response of the Commissioner of Education to eliminate de facto segregation in *561 the schools in Plainfield. The Commissioner allowed the local school board to select one of three plans presented to it to resolve the situation, 45 N.J. at 167, 212 A.2d 1, and the State Board concurred. Id. at 168, 212 A.2d 1. However, the Court rejected this approach and held that the Commissioner and the State Board viewed their power and responsibility to address racial segregation too restrictively, which led to a response that was inconsistent with the State's strong policy against racial segregation. Justice Jacobs wrote:
Our own State's policy against racial discrimination and segregation in the public schools has been long standing and vigorous, and our Commissioner of Education has been vested with broad power to deal with the subject.... As early as 1881 there was legislation in New Jersey declaring it unlawful to exclude a child from any public school because of his race (L. 1881, c. 149) and this appears in broadened form in our current statutes. N.J.S.A. 18:14-2.[2] When called upon, our courts have not hesitated to strike down direct and indirect efforts to circumvent the legislative direction.
New Jersey's strong policy against racial discrimination and segregation in the public schools finds further expression in Article 1, paragraph 5 of the 1947 Constitution. . . .

[Id. at 173-74, 212 A.2d 1 (citations omitted).]
Notably, the Court stated that the Commissioner and State Board must be vigilant to adopt policies to combat "trends towards withdrawal from the school community by members of the majority...." Id. at 180, 212 A.2d 1.
In Jenkins, supra, the Court addressed a petition by residents of Morristown which requested the Commissioner of Education to take suitable steps to prevent Morris Township from withdrawing its students from the high school. 58 N.J. at 485, 279 A.2d 619. The petitioners also sought a merger of the school systems operated by the town and the township. Ibid. The Commissioner acknowledged the racial imbalance between the town and the township and the adverse educational impact which would occur if the township's predominantly white students withdrew from the town high school. Id. at 493, 279 A.2d 619. Nevertheless, the Commissioner opined that he lacked the power to prohibit withdrawal of township students from the town high school or to direct the boards of education of the respective communities to initiate merger of the school systems, or to take any other action to forestall the unsavory effects so readily envisioned. Ibid. The Court disagreed with the Commissioner's interpretation of his powers. Justice Jacobs wrote:
The Commissioner's flat disavowal of power despite the compelling circumstances may be sharply contrasted with the sweep of our pertinent constitutional and statutory provisions and the tenor of our earlier judicial holdings.
Our Constitution contains an explicit mandate for legislative "maintenance and support of a thorough and efficient system of free public schools." Art. 8, sec. 4, para. 1. In fulfillment of the mandate the Legislature has adopted comprehensive enactments which, inter alia, delegate the "general supervision and control of public education" in the State to the State Board of Education in the Department of Education. N.J.S.A. 18A:4-10.

[Id. at 493-94, 279 A.2d 619 (citations omitted).]
*562 The Court also recognized that "[t]he history and vigor of our State's policy in favor of a thorough and efficient public school system" is matched only by its policy against racial discrimination and segregation in the public schools. Id. at 495, 279 A.2d 619. Justice Jacobs suggested that a school which has a feasibly correctable racial imbalance may not be providing a thorough and efficient school system. He said, "[o]n a broad interpretation, schools with feasibly correctable racial imbalances might well currently be viewed as not affording suitable educational facilities within the meaning of the statutory language." Id. at 507, 279 A.2d 619.
In Englewood Cliffs, supra, this court examined a decision by the State Board of Education which denied a petition to withdraw from a sending/receiving relationship and to order a regionalization study of unwilling districts. The State Board denied the petition by Englewood Cliffs to withdraw from its sending/receiving relationship with Englewood because withdrawal would have a substantial negative impact on the receiving district. 257 N.J.Super. at 448, 608 A.2d 914. The factor highlighted by the State Board was the decrease of the Englewood high school white population by 1.6%. Id. at 447, 608 A.2d 914. In affirming this decision, this court rejected Englewood Cliffs' argument that a 1.6% loss of white students is an insubstantial impact. We said:
More to the point is the interrelationship between racial balance and educationa connection Cliffs persists in omitting from its reasoning. These are not isolated factors. They are different sides of the same coin. Our Supreme Court long ago recognized this principle in Morean and Booker, cases decided in the afterglow of Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). A generation later, the promise of Brown remains only partially fulfilled and the optimism it engendered has been sorely tested. In these circumstances, the principle enunciated in Morean and Booker is more hallowed than ever: when children of all races learn to live with and respect each other in school at an early age, education is enhanced and the groundwork is laid for future participation of all in the "mainstream" of human affairs.
On this backdrop, Cliffs' suggestion that the only negative impact of severance was insubstantial is plainly wrong. Indeed, the projected negative impact of severance on DMHS [the Englewood high school] was so substantial that, even if we were to concede Cliffs' characterization of N.J.S.A. 18A:38-13 as a balancing statute, the puny positive impacts projected by Cliffs would clearly have been overwhelmed by the far-reaching and long-term negative impact on DMHS.

[Id. at 464-65, 608 A.2d 914.]
This authority compels three conclusions. First, maintenance of a diverse student population is a critical element in the delivery of a thorough and efficient education. Second, the present racial and ethnic composition of the student body, as well as trends in the student population, are valid factors to be considered by a board of review in considering the effect of the proposed withdrawal and granting or withholding permission to present the issue to the voters. Third, the immediate 9% diminution of the white population and a projected racial and ethnic imbalance in the near future cannot be characterized as insubstantial or negligible. Indeed, the 9% loss in the white population is a substantial negative impact.
North Haledon seeks to distinguish Jenkins and Englewood Cliffs on the basis that they involve the termination of a *563 sending/receiving relationship which is governed by a different statute. The public policy enunciated and explicated in those decisions, however, is not confined to sending/receiving relationships. Indeed, Booker involved a school district's efforts to resolve racial imbalance within the schools of a single city. Moreover, in Englewood Cliffs, this court also affirmed an order by the State Board which required unwilling districts to participate in a regionalization study. Surely then, racial composition of the surviving school population and the avoidance of racial imbalance must be a weighty factor in any decision to dissolve or allow withdrawal of a participant from a regional school district.
In its consideration of the impact of the withdrawal of North Haledon students on the racial composition of the school, the Board of Review cited demographic trends detected in the last census. It concluded that the decline of the white population in the school is inevitable and the withdrawal of North Haledon students cannot be considered a significant contributing factor in the growth of the minority population in the high school. This attitude of helplessness in the face of what the Board of Review perceived to be inevitable fails to recognize the obligation and power of education officials to remediate racial imbalance and, certainly, to refrain from action which will exacerbate racial imbalance. It was in this spirit that this court in Englewood Cliffs severely criticized the tuition policy adopted by a neighboring town which allowed high school students from Englewood Cliffs to attend an alternate public school and affirmed an injunction barring that town and other school districts from accepting Englewood Cliffs' students on a tuition basis. We noted that the Commissioner of Education has broad constitutional and legislative powers concerning public education and the injunction was an appropriate use of that power. 257 N.J.Super. at 473-74, 608 A.2d 914. Judge (now Justice) Long explained:
Here, we have affirmed the State Board's determination that the Tenafly tuition policy had a serious negative impact on the racial balance at DMHS. As Tenafly's non-indigenous population increased, the situation at DMHS worsened. Tenafly not only "lured" and "enticed" Cliffs' students by its "beggarthy-neighbor" policy, and in doing so syphoned off a disproportionate number of high achievers, but also attracted white and Asian Englewood students. Given those findings, the effectuation of the State's constitutional policy in favor of racial balance as a function of the quality of education not only authorized but compelled an injunction against Tenafly.

[Id. at 474, 608 A.2d 914.]
See also Jenkins, supra, 58 N.J. at 504, 507, 279 A.2d 619 (Commissioner has the power to take steps to discourage withdrawal of students and to initiate study of merger of schools to forestall racial imbalance in schools); Booker, supra, 45 N.J. at 178-79, 212 A.2d 1 (Commissioner's power extends beyond addressing segregated schools and includes remedial action to alleviate substantial racial imbalance).
We conclude that the loss of 9% of the white population of the high school is not a negligible educational impact. Coupled with the demographic data showing a substantial increase in the non-white population in the remaining towns, the Board of Review misperceived not only the impact on the racial diversity of the school by withdrawal of North Haledon students but also its obligation to refrain from actions which will exacerbate racial imbalance. Thus, we reverse the order allowing a referendum on the issue of withdrawal by North Haledon.
*564 Due to our decision, the consolidated appeal, A-270-02T5, is moot. The result of the referendum which has occurred shall have no effect.
Reversed.
NOTES
[1] In their motion for stay pending appeal to the Supreme Court, the Borough of North Haledon and its Board point out that white students comprised 51.01% of the student population as of October 2001. This difference does not alter our analysis.
[2] Presently found at N.J.S.A. 18A:38-5.1