753 A.2d 687

IN THE MATTER OF THE GRANT OF THE CHARTER
SCHOOL APPLICATION OF ENGLEWOOD ON
THE PALISADES CHARTER SCHOOL.

IN THE MATTER OF THE GRANT OF THE CHARTER SCHOOL
APPLICATION OF THE CLASSICAL ACADEMY CHARTER
SCHOOL OF CLIFTON, PASSAIC COUNTY.

IN THE MATTER OF THE GRANT OF THE CHARTER SCHOOL
APPLICATION OF THE FRANKLIN CHARTER SCHOOL,
SOMERSET COUNTY.

Argued February 29, 2000—Decided June 28, 2000.

*Eric Martin Bernstein* argued the cause for appellant Englewood City Board of Education (*Mauro, Savo, Camerino & Grant*, attorneys; *Mr. Bernstein* and *Michael V. Camerino*, of counsel and on the briefs).

*Anthony V. D'Elia* argued the cause for appellant Board of Education, City of Clifton.

*Russell Weiss, Jr.,* argued the cause for appellant Franklin Township Board of Education (*Carroll, Weiss & Josephson,* attorneys).

*Lois H. Goodman* argued the cause for respondents Englewood on the Palisades Charter School and The Classical Academy Charter School (*Carpenter, Bennett & Morrissey,* attorneys; *Ms. Goodman* and *Stephen F. Payerle,* of counsel; *Ms. Goodman, Mr. Payerle* and *Melissa B. Popkin,* on the briefs).

*David C. Apy* argued the cause for respondent Franklin Charter School (*McCarter & English,* attorneys; *Mr. Apy* and *Meredith L. Byrant* on the brief).

*Michelle Lyn Miller,* Deputy Attorney General, argued the cause for respondent State Board of Education (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Nancy Kaplen* and *Mary C. Jacobson,* Assistant Attorneys General, of counsel; *Ms. Miller, Arlene Goldfus Lutz* and *John K. Worthington,* Deputy Attorneys General, on the briefs).

*John G. Geppert, Jr.,* argued the cause for *amicus curiae* Morris School District (*Wiley, Malehorn and Sirota,* attorneys).

*David G. Sciarra,* Executive Director, Education Law Center argued the cause for *amicus curiae Abbott* plaintiffs (*Mr. Sciarra* and *Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Sciarra, Lawrence S. Lustberg* and *Lori Outzs Borgen,* on the brief).

*Richard E. Shapiro* submitted a brief on behalf of *amicus curiae* Asbury Park Board of Education.

*Christopher J. Christie* submitted a brief on behalf of *amicus curiae* New Jersey Charter Public Schools Association (*Dughi and Hewit,* attorneys; *Mr. Christie* and *Gary L. Riveles,* on the brief).

The opinion of the Court was delivered by

LAVECCHIA, J.

In this consolidated appeal, the Englewood City Board of Education, the Clifton Board of Education and the Franklin Township

Board of Education (Boards) challenge the grants of charters to newly created charter schools within their respective school districts. The Boards contend that the Charter School Program Act of 1995, *N.J.S.A.* 18A:36A–1 to –18 (Act), is unconstitutional because it violates principles of equal protection and due process, contravenes the prohibition against the donation of public funds for private purposes, and constitutes an improper delegation of legislative power to a private body. The Boards also mount challenges to the Act and its implementing regulations, *N.J.A.C.* 6A:11–1 to –8.2, as applied to the charter schools approved to operate within each of their districts. All of those challenges were comprehensively addressed in the opinion of the Appellate Division authored by the Honorable Michael Patrick King, P.J.A.D. *In re Charter School Application,* 320 *N.J.Super.* 174, 727 *A.*2d 15 (App.Div.1999).

We granted certification, 162 *N.J.* 482, 744 *A.*2d 1206 (1999) and now affirm the Appellate Division's judgment, modifying only its articulation of the Commissioner of Education's responsibilities when reviewing the financial and racial impacts that approval of a charter school will have on a public school district.

I.

The providing of public education in New Jersey is a state function. Our constitution mandates that the Legislature must "provide for the maintenance and support of a thorough and efficient system of free public schools" for New Jersey's children. *N.J. Const.* art. VIII, § 4, ¶ 1. Until recently that obligation has been carried out through a system of local school districts functioning as governmental entities. As the challenge of providing a quality education has become more complex and difficult, however, the Legislature has determined to authorize an alternative format, different from the traditional local school district model and known generally as charter schools, for providing public education to New Jersey children. As defined in New Jersey's enabling Act, a charter school is a public school operated pursuant to a charter

approved by the Commissioner of Education, which is independent of a local board of education and is managed by a board of trustees. *N.J.S.A.* 18A:36A–3.

In choosing to experiment with the use of charter schools, New Jersey is not alone. Our state is one of many that has enacted legislation to permit this alternative. The establishment of charter schools across the nation has varied from state to state, but such schools generally share some common characteristics.

Charter schools are public schools, which through legislative authorization are free from many state and local regulations. See Kevin S. Huffman, Note, *Charter Schools, Equal Protection Litigation, and the New School Reform Movement*, 73 *N.Y.U. L.Rev.* 1290, 1294 (1998) (discussing characteristics of charter schools). Charter schools have more autonomy than other public schools in staffing, curriculum and spending choices. *Ibid.* Generally, if the goals set forth in the school's charter are not fulfilled, the charter is not renewed. See National Conference of State Legislatures, Education Program: Charter Schools (last visited May 30, 2000) <http://www.ncsl.org.programs/educ/charter.htm.> (website discussing background on charter school legislation). Such schools actually are accountable to several groups for both their academic results and fiscal practices, including the charter schools' governmental approving authority, the individuals who organize the schools and the public that funds them.

The charter school movement in the United States started in 1991, when Minnesota enacted the first charter school law. California followed in 1992. U.S. Dep't of Educ., The State Charter Schools 2000: Fourth–Year Report at 11 (Jan.2000) (U.S. Dept. of Educ.).[1] By April 1995, when the Act was being considered by the New Jersey Legislature, twelve states authorized the establishment of charter schools, and a number of other states were

---

[1] Although the Department of Education report was not submitted to this Court by any of the parties involved in the litigation, this Court takes judicial notice of the report pursuant to *N.J.R.E.* 201(b)(3).

considering similar legislation during the 1995–1996 session. Public Hearing before Senate Educ. Comm.: *Senate Bill No. 1796 (The Charter School Program Act of 1995)* (April 28, 1995), 1995–1996 Legislative Session (testimony of Alex Medler, Policy Analyst, Education Commission of the States) at 5X. In 1999 three states, New York, Oklahoma and Oregon, passed charter school legislation, bringing the total number of jurisdictions with charter school laws to thirty-six states and the District of Columbia. U.S. Dept. of Educ., *supra*, at 1.

Proponents of charter schools maintain that "the movement is the first public school reform effort that brings together school choice, entrepreneurial opportunities for teachers and parents, accountability for results, and competition with other schools." Huffman, *supra*, 73 *N.Y.U. L.Rev.* at 1300. Its advocates cite empirical studies and anecdotal evidence about the deterioration of public schools to demonstrate the need for school reform. *Ibid.* Advocates view the charter schools as a way to increase innovation in public schooling, contending that increased activism will promote creativity in management and curricula. *Id.* at 1300–1301. Opponents of charter schools, on the other hand, express concern that "loose regulation will allow charter schools to siphon the wealthiest and best-educated families from traditional public schools," and that the creation of charter schools "will disproportionately burden lower classes and children of color." *Id.* at 1302.

The U.S. Department of Education, in its Year 2000 charter school study, lists "realizing an alternative vision for schooling" as the most important reason given by educators surveyed for establishing charter schools. U.S. Dept. of Educ., *supra*, at 42. Among the other reasons provided by those surveyed were the desire to serve a special population—often students considered to be "at risk"—and the desire to gain autonomy from state or district regulation. *Ibid.*

New Jersey's Charter School Act shares many of the broader goals voiced by advocates of the charter school movement nation-

wide. In the Findings and Declarations section of the Act, the Legislature stated that

charter schools offer the potential to improve public learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for educational improvement; and establish new professional opportunities for teachers.

[*N.J.S.A.* 18A:36A–2.]

The statute further provides that the Legislature "finds that the establishment of a charter school is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools." *N.J.S.A.* 18A:36A–2.

The Act sets forth the procedure for establishing a charter school, *N.J.S.A.* 18A:36A–4, and the information that must be contained in an application for charter school approval. *N.J.S.A.* 18A:36A–5. Operating guidelines, admission and enrollment policies, and transportation services are detailed in the Act. *N.J.S.A.* 18A:36A–7, –8, –11 and –13. As for funding, the Act provides that the district of residence of the charter school shall forward to the school a per-pupil amount set by the Commissioner, but presumptively set by the Legislature at 90% of the local levy budget per pupil for that student's grade level in the district. *N.J.S.A.* 18A:36A–12. The Commissioner cannot set this amount at a level greater than 100%, and may set it lower than the presumptive 90%. *Ibid.* The standards and procedures are detailed in duly promulgated regulations of the State Board of Education (State Board). *N.J.A.C.* 6A:11–1.1 to –8.2. Both the Act's provisions, as well as the regulations, provide for notice to the local school district when an application for approval of a charter school is filed, and an opportunity to appeal the Commissioner's decision on such an application to the State Board. *N.J.S.A.* 18A:36A–4(c), (d); *N.J.A.C.* 6A:11–2.1(b)3, –2.1(e), –2.5.

■ The three school districts challenging the facial validity of the Act in this consolidated appeal essentially disagree with the

legislative decision to allow charter schools to become part of the provision of public education in our state. That argument has been made, and lost, before the Legislature. The choice to include charter schools among the array of public entities providing educational services to our pupils is a choice appropriately made by the Legislature so long as the constitutional mandate to provide a thorough and efficient system of education in New Jersey is satisfied. *See Robinson v. Cahill,* 62 *N.J.* 473, 508–09 & 509 n. 9, 303 *A.*2d 273, *cert. denied,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973) (holding that obligation to provide thorough and efficient system of free public schools is State's constitutional responsibility; determination to enlist local school districts to meet obligation permissible so long as State ensures that means chosen to deliver educational services fulfills constitutional obligation).

Certain principles permeate our school laws. As stated above, one is that the State's obligation to provide a thorough and efficient system of education in our public schools is inviolate. So, too, must the State ensure that no student is discriminated against or subjected to segregation in our public schools. Because of the abiding importance of those two principles and the potential impact of the charter school movement on public education, the Act, and the State's efforts to implement it, require careful scrutiny.

## II.

### *Racial Impact*

■ The Englewood City Board of Education (Englewood) contends that the Act on its face, and as applied, is flawed because the Commissioner is not required to and, in practice, does not assess the effect on racial balance that a charter school may have on a public school district from which it draws its pupils.[2] Engle-

---

[2] In the companion appeal *In re the Greater Brunswick Charter School,* decided today, the Highland Park Board of Education also advances this argument.

wood asks the Court to require the Commissioner to perform a study of the potential racial imbalancing effects of a charter school on a district of residence before the Commissioner approves a charter school application.[3]

Rooted in our Constitution, New Jersey's public policy prohibits segregation in our public schools:

> The history and vigor of our State's policy in favor of a thorough and efficient public school system are matched in its policy against racial discrimination and segregation in the public schools. Since 1881 there has been explicit legislation declaring it unlawful to exclude a child from any public school because of his race (*L.* 1881, *c.* 149; *N.J.S.A.* 18A:38–5.1), and indirect as well as direct efforts to circumvent the legislation have been stricken judicially. In 1947, the delegates to the Constitutional Convention took pains to provide, not only in general terms that no person shall be denied any civil right, but also in specific terms that no person shall be segregated in the public schools because of his "religious principles, race, color, ancestry or national origin." Art. 1, para. 5.
>
> [*Jenkins v. Township of Morris Sch. Dist. and Bd. of Educ.*, 58 *N.J.* 483, 495–496, 279 *A.*2d 619 (1971) (citations omitted).]

New Jersey's abhorrence of discrimination and segregation in the public schools is not tempered by the cause of the segregation. Whether due to an official action, or simply segregation in fact, our public policy applies with equal force against the continuation of segregation in our schools. *Booker v. Board of Educ., Plainfield*, 45 *N.J.* 161, 212 *A.*2d 1 (1965). We have exhorted the Commissioner to exercise broadly his statutory powers when confronting segregation, whatever the cause. *Jenkins, supra*, 58 *N.J.* at 506–07, 279 *A.*2d 619. Responsive to that obligation, the Commissioner has required school districts to monitor racial balance in the public schools. Districts are provided with guidelines to assist them in the review of their schools' pupil populations so they may be vigilant in preventing segregation from occurring and promptly correcting it if it does occur. *New Jersey State Guide-*

---

[3] We note that on the appeal of the Commissioner's approval of the charter school located within Englewood, the State Board affirmed with the caveat that the Commissioner review the racial composition of the charter school before granting final approval.

*lines on the Desegregation and Integration of Public Schools
(Guidelines ).*

The *Guidelines* provide a step-by-step methodology for a school
district to use in establishing the ratio between the district's
overall pupil population percentages for its racial groups and the
population percentages for the same pupil groups for each grade
organization level, *i.e.,* elementary, middle, junior high or high
school. Once established, all schools within each grade organiza-
tion level are compared to the expected pupil percentages, allow-
ing for a reasonable deviation. Use of those *Guidelines* provides
early warning to school district officials if a school within a
particular organizational level, for example an elementary school,
begins to have a pupil population that is substantially out of line
with that of the other elementary schools in the district. Adminis-
trative steps, including but not limited to adjustments in school
assignments or instructional clustering of pupils, are then possible
to keep the school populations within expected ranges or to
otherwise achieve in the students' learning environment appropri-
ate mixtures of pupil populations that reflect the community's
pertinent school age population.

The school-to-school comparisons thus promote learning envi-
ronments in which students are educated among a mix of children
that is reflective of the overall district composition for that organi-
zational level. With charter schools, the Legislature sought to
achieve a comparable result. Balancing the desire to prevent
discrimination on the basis of race in admission policies with a
concomitant desire to prevent racial segregation in the charter
school, the Act provides:

> The admission policy of the charter school shall, to the maximum extent practica-
> ble, seek the enrollment of a cross section of the community's school age popula-
> tion, including racial and academic factors.
>
> [*N.J.S.A.* 18A:36A–8e.]

That language was not included in the original Senate or
Assembly versions of the bill. Originally, Senate Bill No. 1796
contained some general nondiscrimination language and, in Sec-
tion 9, a requirement that if there were more applications than

spaces available a random selection process was to be used. But during an early public hearing, concerns were voiced about the adequacy of those protections. Others expressed the view that charter schools actually could promote desegregation and benefit minority communities. At one of the hearings before the Senate Education Committee, Alex Medler, on behalf of the Education Commission of the States, submitted written testimony that noted general support for the charter school concept and described charter schools as "promising" and a way of "tapping into the knowledge and interest of those best placed to improve schools—teachers and community members close to the kids."

Medler informed the Committee that his organization was collaborating with another educational organization, the Center for School Change, on a survey of the nation's charter schools. He highlighted the comments of one school operator who stated that "[i]f you really want local/community/parent-initiated schools, you need to build capacity in communities of color. If you don't, you're continuing the same biases as everywhere else, based on access to resources." Public Hearing before Senate Educ. Comm.: Senate Bill No. 1796 at 4X–9X (April 28, 1995). But, Medler noted that "this comment points to a broader concern of many opponents of charter schools—that charter schools will benefit a privileged elite of students and communities." He observed that most legislation that has been passed by the states "takes care of these concerns up front ... in the statutes regarding admissions standards, civil rights and language about private school operation, however, concerns about who benefits from charter schools will not go away." *Ibid.*

In response to comments received, the Senate Bill protections were adopted in an enhanced form in the Assembly Committee Substitute for Assembly Bill No. 592, which passed in the Assembly on April 28, 1995. Another hearing was then held, jointly, by the Education Committees of each House of the Legislature. Specific and pointed concerns about racial balance continued to be expressed. For example, Judith Cambria, Executive Director of

the League of Women Voters, testifying at the joint hearing, stated:

> [c]harter schools must not exacerbate racial, ethnic, or class segregation either within the district or across district lines.
>
> . . . .
>
> There must be strong provisions for nondiscrimination and random selection of students to assure that all students have equal access to charter schools. Both private choice programs in foreign countries and uncontrolled public school choice programs in the United States show significant tendencies to increase segregation by race and ethnicity and by socioeconomic status.
>
> [Public Hearing before Senate Educ. Comm. and Assembly Educ. Comm.: Charter Schools (Dec. 5, 1995), 1995–96 legislative session (testimony of Judith Cambria, Executive Director, League of Women Voters) at 80–81.]

As a result of the comments elicited from the joint hearing, the current language of *N.J.S.A.* 18A:36A–8e was added, reflecting the importance that the legislators placed on the need to maintain racial balance in the charter schools. In using, as the pertinent reference, "a cross section of the community's school age population including racial and academic factors," the Act requires that a charter school's admission policy seek a pupil population similar to the pupil population that the *Guidelines* seek for New Jersey's school districts. We see nothing in the Act or its history that is discordant with the State's policy of maintaining nonsegregated public schools in our communities. Nor do we understand the State Board to be suggesting otherwise.

At oral argument, counsel for the State Board informed us that when a school district has raised a legitimate racial-impact concern, the Commissioner has been ordered by the State Board to assess the racial impact caused by the approval of a charter school. We understood that assertion to mean that the Commissioner would be required to consider the racial impact from the perspective of the charter school's proposed pupil population, as well as the effect that loss of the pupils to the charter school would have on the district of residence of the charter school.

The State Board's statement at oral argument is reassuring. It informs us that the agency position is consonant with a fundamental responsibility of the Commissioner. We also were informed

that the State Board is taking steps to facilitate the execution of the Commissioner's responsibility. The State Board is considering new regulations that would require information on pupil recruitment by a charter school to be supplied to the Commissioner for his review by January fifteenth of the year that precedes the inclusion of those pupils in the charter school. That would allow the Commissioner more than a year to assess both the pupil composition proposed for the charter school and the impact of the loss of those pupils on the district of residence, and to react appropriately to that information.

The Commissioner must consider the impact that the movement of pupils to a charter school would have on the district of residence. That impact must be assessed when the Commissioner initially reviews a charter school for approval to open, and on an annual basis thereafter. The Department's *Guidelines* require continuing assessment of a school district's efforts to maintain racial balance among its schools. Continuing assessment of the charter school's pupil population and impact on the district of residence must also occur. Obviously, if a charter school were to recruit systematically only pupils of a particular race or national origin, the Commissioner would be obliged to stop that activity and, if necessary, to revoke the approval of a charter school engaging in such tactics. So, too, must the Commissioner be prepared to act if the *de facto* effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence. The Commissioner's obligation to oversee the promotion of racial balance in our public schools to ensure that public school pupils are not subjected to segregation includes any type of school within the rubric of the public school designation.

The constitutional command to prevent segregation in our public schools superimposes obligations on the Commissioner when he performs his statutory responsibilities under the Charter School Act. See *Board. of Educ. of Borough of Englewood Cliffs v. Board of Educ. of Englewood,* 257 *N.J.Super.* 413, 608 *A.2d* 914

(App.Div.1992), *aff'd* 132 *N.J.* 327, 625 *A.*2d 483, *cert. denied,* 510 *U.S.* 991, 114 *S.Ct.* 547, 126 *L.Ed.*2d 449 (1993) (holding that Commissioner's and State Board's broad constitutional and legislative responsibilities in supervising public schools, including compliance with constitutional prohibition against segregation in public schools, justified State Board's order for study of whether severance of sending-receiving relationship may be precluded due to racial balancing concerns). We need not conclude that the Act is unconstitutional because it does not expressly state in detail how the Commissioner is to fulfill that constitutional obligation. As we have stated, the Act's language is not discordant with the obligation nor is its legislative history suggestive of any impermissible underlying legislative objective to subvert our constitutional policy prohibiting segregation in the public schools. The Legislature is presumed to have full knowledge of, and to act consistently with, the constitution's requirements. *Lomarch Corp. v. Mayor and Common Council of Englewood,* 51 *N.J.* 108, 113, 237 *A.*2d 881 (1968). Furthermore, the State Board does not maintain a contrary position before us with regard to the Act's intent.

Accordingly, we hold that the Commissioner must assess the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate. We express no view on the formality or structure of that analysis except to state that it must take place before final approval is granted to a charter school applicant. We otherwise leave the form and structure of that analysis to the Commissioner and State Board to determine. We simply hold that the Commissioner's obligation to prevent segregation in the public schools must inform his review of an application to approve a charter school, and if segregation would occur the Commissioner must use the full panoply of his powers to avoid that result. The statutory authorization to approve a charter school does not affect the Commissioner's constitutional obligation to prevent segregation in the public schools. Similarly, there is a need to consider the impact a charter school has on other school districts if school districts outside the district of residence provide pupils to fill charter

school openings not filled by pupils from within the charter
school's district of residence. In performing this evaluation, we
note that the Commissioner already requires ongoing and regular
assessments of racial balance in the public schools in the normal
course of his supervision. See *Guidelines, supra.*

In sum, segregation, however caused, must be addressed. To
be timely addressed, assessment cannot wait until after a charter
school has been approved for operation and is. already taking
pupils from the public schools of a district of residence. The
Commissioner must assess whether approval of a charter school
will have a segregative effect on the district of residence of the
charter school. Once a charter school is operating, the Commis-
sioner must also assess whether there is a segregative effect in
any other district sending pupils to the approved charter school.
Contrary to Englewood's arguments, we are not persuaded that
*N.J.S.A.* 18A:38–13, pertaining to sending-receiving relationships,
has any relevance here. We leave it to the State Board and the
Commissioner to determine how to accomplish their task.

We acknowledge the preliminary stage of the State Board's rule
proposal. We trust that the final version of the rule will provide
the Commissioner with pertinent pupil information early enough
in the charter school approval process to facilitate the review the
Commissioner must now perform.

## III.

### Economic Impact

■ The funding mechanism of the Act provides:

The school district of residence shall pay directly to the charter school for each
student enrolled in the charter school who resides in the district a presumptive
amount equal to 90% of the local levy budget per pupil for the specific grade level
in the district. At the discretion of the commissioner and at the time the charter is
granted, the commissioner may require the school district of residence to pay
directly to the charter school for each student enrolled in the charter school an
amount equal to less than 90% percent, or an amount which shall not exceed 100%
of the local levy budget per pupil for the specific grade level in the district of
residence. The per pupil amount paid to the charter school shall not exceed the

local levy budget per pupil for the specific grade level in the district in which the charter school is located. The district of residence shall also pay directly to the charter school any categorical aid attributable to the student, provided the student is receiving appropriate categorical services, and any federal funds attributable to the student.

[*N.J.S.A.* 18A:36A–12.]

The three Boards predict that this loss of funds, in the presumptive amount of 90% of the local levy budget per pupil [4] (although the Commissioner may set that amount at a level lower than 90%, or higher, but not to exceed 100%), will cause dire consequences for their respective school districts. None claim, however, that the approval of the charter schools in this consolidated appeal will cause it to cease providing a thorough and efficient education to its remaining pupils. Nevertheless, the Boards argue that the Commissioner should be compelled to examine the economic impact upon a district of residence as a result of the approval of a charter school when the Commissioner determines whether to grant that approval. As with its racial impact argument, Englewood specifically contends that there should be an impact analysis comparable to the type of feasibility study performed when the Commissioner is reviewing a change in a sending-receiving relationship. *See N.J.S.A.* 18A:38–13.

The State Board contends that the Commissioner should not be faulted for failing to evaluate expressly the financial consequences to a district of residence that result from the approval of a charter school within its borders. The State's argument is premised on the Act's silence concerning any such requirement in the application process. Moreover, the State Board emphasized that there is

---

[4] We note that the State Board's amended definition of "local levy budget per pupil" in its regulations governing charter schools has been held to be an unfunded mandate by the Council on Local Mandates. *In re Complaints Filed by the Highland Park Board of Education and the Borough of Highland Park,* Nos. 10–98 & 12–98 (May 11, 2000), available at <http://www.state.nj.us/localmandates/decisions.html>. That ruling invalidates the regulation's effect of eliminating a district of residence's choice to pay the *lower* of either 90% of the maximum T & E amount per pupil or 90% of the program budget. We express no view on the merits of the Council's ruling, but simply acknowledge its impact on the Commissioner's fiscal review.

no evidence in this record that any district with an approved charter school is unable to provide a thorough and efficient education to its pupils. The Appellate Division concurred with the State Board, observing that it was "the Legislature's choice not to include the [financial] impact on the existing district among the criteria for approval of the charter." 320 *N.J.Super.* at 227, 727 *A.*2d 15.

The legislative history of the Charter School Act reveals that the provisions of Section 12 were added to the legislation to address concerns raised by various groups at the public hearings about funding. The funding provisions of the Act evolved from earlier versions. The original version of Assembly Bill No. 592, pre-filed for introduction in the 1994 session, authorized boards of education to establish teacher-parent cooperative schools, and provided, in Section 6, that "a teacher-parent cooperative school shall be funded in the same manner as are the other schools of the district, pursuant to regulations established by the State Board of Education."

The original version of Senate Bill No. 1796, introduced in February 1995, contained the following funding provision in Section 13:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district *an amount equal to the local levy budget per pupil in the district for the specific grade level.* The district shall also pay directly to the charter school any categorical aid attributable to the student, provided the student is receiving appropriate categorical services, and any federal funds attributable to the student.
>
> [Sen. No. 1796, § 13 (introduced Feb. 9, 1995)(emphasis added).]

As noted earlier, following the introduction of the Senate bill, the Senate Education Committee conducted two public hearings during April 1995. During the course of those hearings, several witnesses addressed the potential financial impact charter schools could have on the local public schools. A common theme was the fear concerning what the loss of 100% of the local levy budget per pupil would mean for the district of residence. In particular, commentors expressed concern about how a district would handle

the loss of funds and still cover the fixed costs for the school district.

John Henderson, testifying on behalf of the New Jersey School Boards Association, summarized the problem of fixed costs:

> As much as 30 percent of district operations are in non-personnel fixed and residual costs. By way of example, in a district with 3500 pupils and five buildings, the loss of 300 students to a charter school could cost the district as much as $3 million in State and local funds.
>
> . . . .
>
> Yet if they lost the $3 million in State and local funds, they would still have five buildings to run, debt service to be paid, maintenance to be performed, space to be heated and insured. In recognition of the problem of fixed cost staying at the local district, charter school initiatives in other states have limited the funding that follows the child to less than 100 percent or allows the matter to be negotiated directly between the district and/or the State and charter school.
>
> [Public Hearing before Senate Education Committee and Assembly Education Committee: Charter Schools (Dec. 5, 1995) (testimony of John Henderson, Associate Director, N.J. School Boards' Assoc.) at 6–7; *see also* Legislation Analysis of New Jersey School Board Association at 117X.]

In December 1995, the Senate adopted the Senate Committee Substitute for Assembly Bill No. 592 and Senate Bill No. 1796. Section 12 of that bill substantially modified the funding provisions contained in the Assembly Committee Substitute and in the original Senate bill to read in the manner now contained in the Act.

As noted, Section 12 of the Act reduced the per-pupil amount that would be forwarded from the district of residence to the charter school from 100% to 90% and made it a presumptive amount. The Commissioner may set the amount higher, up to 100%, or lower than the presumptive amount chosen by the Legislature. The evolution of this provision demonstrates that the Legislature responded to concerns about the loss of 100% of per-pupil funding to the charter school and intended to give the Commissioner discretion in setting the percentage of local level budget per pupil at a figure appropriate both for the charter school and for the district of residence.

While the focus of the examination that the Commissioner must perform in setting the per-pupil amount is on the charter school

applicant, the Commissioner cannot reasonably be expected to perform that function in a vacuum. The obligation to supervise the provision of a thorough and efficient system of education in all public schools is omnipresent for the Commissioner. *N.J.S.A.* 18A:4–23. The Commissioner cannot review the charter school's needs and set a per-pupil amount to be shifted from the district of residence without being circumspect about the district of residence's continuing ability to provide a thorough and efficient education to its remaining pupils. We conclude, however, that the Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met.

The Act affirmatively entitles the district of residence to analyze the charter school applicant's submission to the Commissioner and to challenge or augment the applicant's submitted information. *N.J.S.A.* 18A:36A–4c; *N.J.A.C.* 6A:11–2.1. Further, the Legislature has put districts on notice that the presumptive per pupil loss shall be 90%. *N.J.S.A.* 18A:36A–12. Read in combination, those statutory provisions require a district of residence to make an initial showing that imposition of the presumptive amount, or a proposed different amount for the charter school applicant's pupils would impede, or prevent, the delivery of a thorough and efficient education in that district.[5] We note, however, that application of this standard in the context of an Abbott district is not part of this case. We leave that question for another day.

We do not regard the discretion allotted to the Commissioner under the Act, when determining whether to apply the presumptive percentage or to apply a different percentage, to be controlled by focusing on the financial consequences to a district of residence. But, if a district of residence demonstrates with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized by loss of the presumptive

---

[5] We note that this standard shall not apply to actions under *N.J.A.C.* 6A:11–7.3(e) when it appears that the charter school has accumulated a surplus.

amount, or proposed different amount of per-pupil funds to a charter school, then the Commissioner is obligated to evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education. The Commissioner is well positioned to analyze such contentions and should do so when they arise.

The thrust of that legislative initiative was to advance the creation of charter schools as stated in *N.J.S.A.* 18A:36A–2, and the Act should be applied to promote that objective. The Legislature chose to finance the charter schools from monies provided to the district of residence of the charter school. The districts' fears and concerns were heard and addressed by the adjustments to Section 12 of the Act, which now contains the 90% presumptive amount provision.

No district involved in these charter school applications contends that it cannot meet thorough-and-efficient education requirements. No evidence was presented raising constitutional concerns about the ability to provide a thorough and efficient education. In appropriate circumstances, the Commissioner must act to avoid a failure to provide a thorough and efficient education threatened in a district of residence because of the approval of a charter school, but no such threat is presented by the facts in these cases.

Moreover, we note the State Board's assertion that a local district's concern about thorough-and-efficient education requirements could be raised at numerous stages, such as during the district's budget review process when the district would also have an opportunity to make a factual demonstration that a thorough and efficient education could not be provided, or if a charter school sought a change from the presumptive amount under Section 12. Concerning the latter, we were informed at oral argument that no charter school has made such a request. In any event, the Commissioner has broad supervisory powers at his disposal to address a district's legitimate concerns. He also has specific and powerful remedies available to him under the Comprehensive

Education Improvement and Financing Act (CEIFA), *N.J.S.A.* 18A:7F–1 to –36. *See N.J.S.A.* 18A:7F–6(a), (b).

In sum, we hold that the Commissioner must consider the economic impact that approval of a charter school will have on a district of residence when during the approval process a district makes a preliminary showing that satisfaction of the thorough-and-efficient education requirements would be jeopardized. That information is necessarily pertinent to the Commissioner's determination of whether to approve a charter school applicant and use the presumptive per-pupil funding amount set by the Legislature in the Act, or to use any different amount. However, the district must be able to support its assertions. We do not impose on the Commissioner the burden of canvassing the financial condition of the district of residence in order to determine its ability to adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests. The legislative will to allow charter schools and to advance their goals suggests our approach which favors the charter school unless reliable information is put forward to demonstrate that a constitutional violation may occur.

## IV.

Finally, all three Boards raised facility issues in their challenges to the Act, and its regulations, as applied to the charter schools in their districts. The Appellate Division ultimately determined those issues to be moot because facilities were approved by the Commissioner for use by the respective charter schools prior to the Commissioner's grant of final approval to each. We view the process employed by the Commissioner to be deserving of brief comment.

■ *N.J.S.A.* 18A:36A–5 requires that an application for a charter school "shall include," among other information, "a description of, and address for, the physical facility in which the charter school will be located. . . ." In implementing the application process, the State Board has promulgated a regulation that establishes a two-step process for application submission and review.

*N.J.A.C.* 6A:11–2.1(b)1 requires a charter school applicant to complete the Department of Education's "New Jersey Charter Schools Application," which is to include a description of the informational items listed in *N.J.S.A.* 18A:36A–5 and a description of how those items relate to such matters as the charter school mission, objectives, special populations, and transportation needs.

Despite that itemization of information that the Commissioner required in order to approve or deny a charter, subsection (g) of the regulation permits the Commissioner to approve a charter application but delay its effective date until certain necessary documentation is received and approved by the Commissioner. Subsection (g) specifically permits a charter school seeking final approval to submit information not available at the time of the application's submission, including such information as identification of its facility and lease, mortgages or title to its facility, a certificate of occupancy by the appropriate local official, a sanitary inspection report and a fire inspection certificate. *N.J.A.C.* 6A:11–2.1(g)3 to 6. Only when this documentation is submitted and approved may the Commissioner grant final approval to a charter school to commence operation. *N.J.A.C.* 6A:11–2.1(h).

In essence, the State Board has broken down the application process into discrete steps. By proceeding in that manner, the State Board's regulation permits the Commissioner to conduct an orderly processing of the necessary components of the application. We conclude that the charter schools' argument on this point is practical and reasonable. They have informed us that often it is not until a charter school applicant receives a preliminary approval from the Commissioner and the staff assisting him in this detailed review of an application, that the applicant takes the next step of legally and financially committing to a specific site for the school. The Commissioner's step-by-step review process, pursuant to a duly promulgated regulation of the State Board, is a reasonable implementation of the Act. We see no reason to interfere with the method chosen by the Commissioner and State Board for fulfilling the Act's substantive requirements. The procedure set forth in

*N.J.A.C.* 6A:11–2.1 is efficient and practical both for the applicant and for the Department and does not prejudice any legitimate objection to the charter school application.

## V.

For the foregoing reasons, the judgment of the Appellate Division, as modified by this opinion, is affirmed.

STEIN, J., concurring.

I join the Court's thoughtful, comprehensive, and persuasive disposition of this appeal. I write separately only to add an observation that I am confident is implicit in the Court's opinion. The Court correctly observes that "[t]he choice to include charter schools among the array of public entities providing educational services to our pupils is a choice appropriately made by the Legislature so long as the constitutional mandate to provide a thorough and efficient system of education in New Jersey is satisfied." *Ante* at 323, 753 *A.*2d at 691. Because the constitution authorizes the Legislature to determine the means by which a thorough and efficient education is to be provided, I read and understand the Court's opinion as neither expressing nor implying any view about the wisdom of that legislative choice. See *State v. Des Marets*, 92 *N.J.* 62, 65, 455 *A.*2d 1074 (1983) (stating that "We do not pass on the wisdom of this legislation's mandatory three year imprisonment or the wisdom of its imposition on the offenses covered. That is a matter solely for the Legislature to decide.")

*For affirmance as modified*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA, HAVEY and CARCHMAN—7.

*Opposed*—None.