**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3690-14T3

BOARD OF EDUCATION OF THE
CITY OF HOBOKEN, HUDSON COUNTY,

    Petitioner-Appellant,

v.

NEW JERSEY STATE DEPARTMENT OF
EDUCATION and BOARD OF TRUSTEES
OF THE HOBOKEN DUAL LANGUAGE
CHARTER SCHOOL,

    Respondents-Respondents.

_____

       Argued May 2, 2017 — Decided June 29, 2017

       Before Judges Reisner, Koblitz and Rothstadt.

       On appeal from the Commissioner of Education.

       Eric L. Harrison argued the cause for
       appellant (Methfessel & Werbel, attorneys; Mr.
       Harrison, of counsel and on the brief; Kegan
       S. Andeskie, on the brief).

       Viola S. Lordi argued the cause for respondent
       Board of Trustees of Hoboken Dual Language
       Charter School (Wilentz, Goldman & Spitzer,
       attorneys; Ms. Lordi, of counsel and on the
       brief; Gordon J. Golum and Maureen S. Binetti,
       on the brief).

       Donna S. Arons, Deputy Attorney General,
       argued the cause for respondent Department of
       Education (Christopher S. Porrino, Attorney

General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Ms. Arons and Frederick Wu, Deputy Attorneys General, on the brief).

Avram D. Frey argued the cause for amicus curiae American Civil Liberties Union of New Jersey and Education Law Center (Gibbons, P.C., Education Law Center, and American Civil Liberties Union of New Jersey Foundation, attorneys; Lawrence S. Lustberg, Mr. Frey, David Sciarra, Elizabeth Athos, Edward Barocas and Alexander Shalom, on the brief).

Paul P. Josephson argued the cause for amicus curiae New Jersey Charter Schools Association (Duane Morris LLP, attorneys; Mr. Josephson, on the brief).

PER CURIAM

The Board of Education of the City of Hoboken, Hudson County (Hoboken) appeals the Commissioner of Education's (Commissioner) March 20, 2015 grant of the Hoboken Dual Language Charter School's (HoLa) application to expand its grade-level offerings to seventh and eighth grade. Hoboken claims that the Commissioner failed to consider the charter school's alleged segregative and funding impact on the district and improperly declined to hold a hearing, conduct interviews, or gather more facts concerning the charter school's policies. Because neither the methodology used by the Commissioner nor his decision were arbitrary, capricious, or unreasonable, we affirm.

On October 15, 2013, HoLa submitted a charter renewal and expansion application to the Commissioner and Hoboken. The Hoboken

Superintendent fully supported Hola's charter renewal, but objected to its expansion. On March 5, 2014, Evo Popoff, the Chief Innovation Officer at the Department of Education (the Department), acting on the Commissioner's behalf, renewed HoLa's charter for five years, through June 30, 2019. Popoff also permitted the elementary school to add a seventh-grade class for the 2016-2017 school year and an eighth-grade class for the 2018-2019 school year.

Hoboken appealed, and after our remand to the Commissioner upon application of the Department, and after the parties submitted additional materials, the Commissioner again granted HoLa's renewal and expansion application on March 20, 2015. We denied a stay.

The City of Hoboken has a public school system for students in grades kindergarten (K) through 12 consisting of four public schools: Brandt, Calabro, Connors and Wallace. It also includes three charter schools including HoLa, and four private, tuition-based K-8 schools.

According to HoLa, the original intent of its founders was to implement a dual-language program (Spanish and English) at Hoboken's Connors school (the district's most segregated and poorest school), but Hoboken rejected the plan. HoLa then applied for and was granted a charter to operate a dual-language school

beginning in September 2010, starting with grades K-2 and expanding each year until HoLa encompassed grades K-6. HoLa is located in a low-income section of Hoboken, close to the Connors school.

Students are admitted to HoLa through a lottery with no interviews. No demographic data is collected until students are registered. In order to represent a cross section of the Hoboken community, HoLa holds open houses and tours and advertises in local publications. It also partners with local organizations to recruit on-site. Dates for the open houses, tours and events, as well as the lottery, are posted on the school's website and are printed on flyers "distributed throughout the city." In addition, applications and brochures are mailed to every low-income household each year prior to the lottery. HoLa's parents and teachers also canvass subsidized and public housing and help complete applications on the spot.

Parents may enroll children in the lottery online, in person, or by a phone call to the school. HoLa has a sibling preference, so that if a child is enrolled in HoLa, that child's younger sibling will have priority over other lottery applicants. On December 23, 2014, HoLa submitted a request to the Commissioner to include a low-income preference in its lottery.[1]

---

[1] This request was granted in December 2015 after the record in this case closed.

Initially, in 2013, Popoff conducted "a comprehensive review" of HoLa, "including the evaluation of the school's renewal application, annual reports, student performance on state assessments, site visit results, public comments, and other information." Popoff found that HoLa was "providing a high-quality education to its students." In the 2012-2013 school year, 82% of HoLa's students were at least proficient in Language Arts, while 91% were at least proficient in math. By comparison, only 50% of Hoboken's traditional public school students were at least proficient in Language Arts and 52% were at least proficient in math.

After the remand, the parties submitted more information, including census and student enrollment data. According to 2010 U.S. Census data, Hoboken's under-seventeen population was 57% white, 26% Hispanic, and 16% "other" reflecting a significant increase in the percentage of white children from the 2000 Census data, which showed Hoboken's under-seventeen population as 39% white, 46% Hispanic, and 15% "other." In the 2009-2010 school year (the year before HoLa started operating), Hoboken's traditional public school student population was 22% white, 59% Hispanic, 15% black, and 4% Asian. By the 2013-2014 school year, four years after HoLa began, Hoboken's traditional public school student population had increased its percentage of white students

from 22% to 27%.

The Commissioner considered the racial breakdown of the students in the public and charter schools for 2012-2013 and 2013-2014. Between these school years, the percentage of white students at HoLa rose from 60.6% to 63%, while Connors rose from only 3.9% white students to 4%. Brandt rose from 61.5% to 72%, and Wallace rose from 32.6% to 43%. The final public school, Calabro, dipped from 34.6% to 32%. As can be seen by these statistics, minority students are heavily concentrated at Connors, where in both years they made up approximately 95% of the student population. The percentage of students receiving free or reduced-price lunch decreased for all four Hoboken public elementary schools from 2010-2011 to 2013-2014, although at Connors 88% of the students still received a lunch subsidy in 2013-2014.

In addition to considering the submitted materials, the Office of Charter Schools conducted its own review of data focusing on race and ethnicity to determine whether HoLa was having a segregative effect on the Hoboken Public School District, stating: "After the Department's analysis of publically available student enrollment data, census data, and documentation submitted by the parties, it has been determined that HoLa does [not] and will not have a segregative effect on [Hoboken]." The Commissioner explained:

> [A]lthough HoLa enrolls a higher percentage of White students, and a smaller percentage of Black and Hispanic students than [Hoboken], the percentage of White students attending [Hoboken] has actually increased since HoLa opened in 2010 with the percentage of Hispanic students decreasing in that same period. The percentage of Black students in [Hoboken] has stayed fairly constant since 2010. The increase in percentage of [Hoboken's] White students since 2010, along with the decrease in Hispanic students, and the lack of changes to the percentage of Black students indicates that HoLa's enrollment has not had a segregative effect on [Hoboken]. Instead, the data points towards an overall population shift in the last ten years in the City of Hoboken, which began before the opening of HoLa Charter School.

Hoboken argues that in granting the expansion of HoLa's charter to include seventh and eighth grades, the Commissioner: 1) failed to consider HoLa's alleged racially and economically segregative effect; 2) failed to consider the funding impact to students affected by poverty and special needs; and 3) failed to conduct interviews, gather facts, or hold a hearing to consider HoLa's policies and practices.

Our review of the Commissioner's decision is limited. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). "[A] court may intervene when 'it is clear that the agency action is inconsistent with its mandate.'" Ibid. (quoting In re Petition for Rulemaking, 117 N.J. 311, 325 (1989)).

> [A]lthough sometimes phrased in terms of a search for arbitrary or unreasonable agency

7                                          A-3690-14T3

action, the judicial role [in reviewing an agency's action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

> [Id. at 385-86 (quoting Mazzo v. Bd. of Trs., 143 N.J. 22, 25 (1995)) (second alteration in the original).]

In reviewing administrative decisions, however, courts are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Shim v. Rutgers, 191 N.J. 374, 384 (2007) (quoting In re Taylor, 158 N.J. 644, 658 (1999)). Nevertheless, "case law has recognized the value that administrative expertise can play in the rendering of a sound administrative determination." In re Proposed Quest Acad., supra, 216 N.J. at 389.

The Supreme Court gave the following overview of the law regarding charter schools:

> The Charter School Program Act of 1995 (the Act) . . . (codified as amended at N.J.S.A. 18A:36A-1 to -18), authorizes the establishment of charter schools in New Jersey. See N.J.S.A. 18A:36A-2 (finding that charter schools "can assist in promoting comprehensive educational reform" and that their establishment "is in the best interests

of the students of this State"). The Act charges the Commissioner of Education (Commissioner) with the responsibility to establish a program to "provide for the approval and granting of charters to charter schools pursuant to [the Act]." N.J.S.A. 18A:36A-3. The application process is governed by the Act, see N.J.S.A. 18A:36A-4, -4.1, and -5, and implementing regulations, see N.J.A.C. 6A:11-2.1. . . . Ultimately, the Commissioner has the "final authority to grant or reject a charter application." N.J.S.A. 18A:36A-4(c); see also N.J.A.C. 6A:11-2.1(a).

[In re Proposed Quest Acad., supra, 216 N.J. at 373.]

"Charter schools are public schools, which through legislative authorization are free from many state and local regulations." In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 320 (2000) (Englewood). The Commissioner must conduct a "comprehensive review" before granting a charter renewal. In re Red Bank Charter Sch., 367 N.J. Super. 462, 469 (App. Div.), certif. denied, 180 N.J. 457 (2004); N.J.A.C. 6A:11-2.3(b). "[I]f the goals set forth in the charter school's charter are not fulfilled, the charter is not renewed." Englewood, supra, 164 N.J. at 320.

### I. Racial Segregative Impact

Hoboken first argues that the Commissioner erred by using incomplete or flawed data and ignoring relevant data when finding that HoLa has not had and will not have a racially segregative impact. "Rooted in our Constitution, New Jersey's public policy

prohibits segregation in our public schools." Id. at 324. "[T]he Commissioner is required to monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates." In re Red Bank Charter Sch., supra, 367 N.J. Super. at 471. The "form and structure" of the segregation analysis is up to the Commissioner and the state Board of Education to determine. Englewood, supra, 164 N.J. at 329.

Hoboken complains of two problems with the data: 1) pre-K data was improperly included in the Department's reports for 2013-2014 and 2) the Commissioner used census data inclusive of the entire Hoboken population under age seventeen instead of data for only the school-age population. Hoboken argues that because the 2013-2014 Department's report erroneously included data for pre-K students in the district and HoLa did not enroll pre-K students, the report was not an accurate reflection of Hoboken's population. The Department data included data from the Brandt school, which served only pre-K and K students, and which enrolled a higher percentage of white students than the other public schools (62% white in 2012-2013 and 72% white in 2013-2014).

It is true that HoLa did not admit pre-K students and the Department's statistics for 2013-14 included data for pre-K students. However, the Department's 2012-2013 data did not include the pre-K data, and those numbers were relied upon to the same

extent as the 2013-2014 numbers. Moreover, the inclusion of the pre-K data did not skew the statistics; although the pre-K data included Brandt, a predominately white school in the district, those same statistics also included data on Wallace and Connors, schools that were predominately minority, and which also added pre-K in the 2013-2014 school year. Thus, contrary to Hoboken's suggestion, the inclusion of Brandt did not skew the statistics. And, although HoLa did not offer pre-K, "trends in the student population" are "valid factors" to be considered when determining whether an action will have a segregative impact. In re Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. from the Passaic Cty. Manchester Reg'l High Sch. Dist., 363 N.J. Super. 130, 142 (App. Div. 2003) (N. Haledon I), aff'd as mod., 181 N.J. 161 (2004). The Commissioner properly considered the pre-K data because it provided solid evidence of the trends in the student population.

Hoboken also complains that the Commissioner erred in considering census information concerning all of the children under age seventeen in Hoboken and not just those of school age. It argues this was error because: 1) the statute requires a review of the community's "school age" population; 2) the under-five age group is overrepresented in the Hoboken population; and 3) the relevant comparison is that of the student population in the

district, not the student population of Hoboken.

N.J.S.A. 18A:36A-8(e) addresses enrollment preferences, stating: "The admission policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population, including racial and academic factors." The racial make-up of students expected to enroll in school in the next four years is a trend that the Commissioner should consider. N. Haledon I, supra, 363 N.J. Super. at 142.

Hoboken argues that the relevant statistics were those that compared HoLa's student population to the student population of the traditional public school system, not to the population of those under age seventeen. To support its position, it cites to Englewood, which states the Commissioner "must consider the impact that the movement of pupils to a charter school would have on the district of residence" and it is the Commissioner's "obligation to oversee the promotion of racial balance in our public schools to ensure that public school pupils are not subjected to segregation." Englewood, supra, 164 N.J. at 328 (emphasis added). Hoboken also cites to N.J.A.C. 6A:11-2.2(c) that states in part that "the Commissioner shall assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence."

N.J.S.A. 18A:36A-8(e), however, states that a charter school's admission policy must seek to enroll "a cross section of the community's school age population." (Emphasis added). This indicates that the entire community, not just the students enrolled in the public schools, must be considered. Any other interpretation would exclude potential students who had already elected not to attend public schools, but who were part of the population eligible to attend the public schools. A simple comparison between the charter schools and the traditional public schools is not necessarily representative of the demographics: based on 2013-2014 data, 65% of Hoboken's school-age population was white, but only 27% of Hoboken's students were white. This was largely the result of four private K-8 schools that enrolled thousands of Hoboken's students. Consequently, the analysis is complicated. It is not fair to HoLa to refuse to recognize the impact of the private schools on overall school enrollment in Hoboken, as HoLa has no control over private school enrollment. Hoboken presents no data of its own to support its positions. The Commissioner did not act arbitrarily in considering the data presented.

Assuming that the data the Commissioner relied on was correct, Hoboken maintains that the Commissioner's legal interpretation of that data was wrong in that "the lack of a documented increase in

HoLa's segregative impact on Hoboken's school-aged children does not negate the <u>existence</u> of the segregative impact." We have stated:

> [A] Charter School should not be faulted for developing an attractive educational program. Assuming the school's enrollment practices remain color blind, random, and open to all students in the community, the parents of age eligible students will decide whether or not to attempt to enroll their child in the Charter School and any racial/ethnic imbalance cannot be attributed solely to the school. To close this school would undermine the Legislature's policy of "promoting comprehensive educational reform" by fostering the development of charter schools.
>
> [<u>In re Red Bank Charter Sch.</u>, <u>supra</u>, 367 <u>N.J. Super.</u> at 478 (quoting <u>N.J.S.A.</u> 18A:36A-2).]

In <u>Red Bank</u>, as here, a disparity existed between the enrollment of minority students in the charter school and the traditional public schools. <u>Id.</u> at 473-74. We were concerned that after initial enrollment, the charter school in <u>Red Bank</u> decreased the percentage of minority students as the students progressed toward graduation, with the argument being made that the charter school frequently returned minority students with poor academic records to the public schools just in time for standardized testing. <u>Id.</u> at 479. We determined that the charter school's "manner of operation of the school after its color-blind lottery, warrants closer scrutiny to determine whether some of the school's practices may be worsening the existing racial/ethnic

A-3690-14T3

imbalance in the district" and remanded to the Commissioner to determine "whether remedial action is warranted." Id. at 480, 482. Despite the stark disparity in Red Bank, however, we approved the renewal and expansion of the charter school. Id. at 486. Unlike in Red Bank, there are no allegations that HoLa's practices after the enrollment of students by an impartial lottery exacerbated the racial or ethnic balance.

In addition to the arguments Hoboken makes in the context of the charter school statutory scheme, it also argues that the Commissioner violated his duty to enforce the "Thorough and Efficient Education" clause of the New Jersey Constitution when he failed to remedy de facto segregation caused by HoLa's expansion. In the "Education Clause" or the "Thorough and Efficient Provision," the New Jersey Constitution provides: "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 3; see Petition for Authorization to Conduct a Referendum on Withdrawl of N. Haledon Sch. Dist. v. Passaic Cty. Manchester Reg'l High Sch. Dist., 181 N.J. 161, 173 n.3 (2004) (N. Haledon II). "[R]acial imbalance resulting from de facto segregation is inimical to the constitutional guarantee of a thorough and

efficient education." Id. at 177. The Commissioner must "exercise broadly his statutory powers when confronting segregation, whatever the cause." Englewood, supra, 164 N.J. at 324. However, it is "not really possible to establish a precise point when a thorough and efficient education is threatened by racial imbalance." N. Haledon II, supra, 181 N.J. at 183.

In North Haledon, the Borough of North Haledon sought a referendum to determine whether it should be allowed to withdraw from the Passaic County Manchester Regional High School District. Id. at 164. Although the Board of Review granted the withdrawal, several interested parties objected arguing that the Board failed to assess the impact of the withdrawal on the racial makeup of the high school, given the white student population would decrease by nine percent, and that the percentage of minorities would continue to rise and the white population would continue to decline due to population trends in the sending towns. Id. at 164, 174. Our Supreme Court stated:

> Not every action that reduces the percentage of white students necessarily implicates the State's policy against segregation in the public schools. . . . What we do know is that in this case, demographic trends are contributing to a steady decrease in the number of white students attending Manchester Regional, and that North Haledon's withdrawal will accelerate this trend. Rather than using the demographic trend as an excuse for approving North Haledon's petition, the Board should have considered the ameliorative effect

16

of denying the petition on the racial balance at Manchester Regional.

[Id. at 183.]

Hoboken does not, however, show that expanding HoLa will increase racial imbalance as it did in North Haledon. To the contrary, the percentage of white students in Hoboken schools increased since HoLa opened.

## II. Economic Segregation

Hoboken also claims that the Commissioner failed to consider the economic disparity between the student populations of HoLa and the district. It points out that while 11% to 16% of HoLa's population qualified for free or reduced-price lunch, Hoboken had much higher levels in some schools. N.J.S.A. 18A:36A-8 does not specifically address economic factors, instead requiring the admission policy of a charter school to "seek the enrollment of a cross section of the community's population including racial and academic factors."

The evidence showed that HoLa's policies are geared toward admitting a cross section of the school-aged population, economically as well as racially and ethnically. HoLa canvassed and advertised in Hoboken's subsidized housing developments. On December 23, 2014, HoLa submitted a successful request to the Department to include a low-income preference in its lottery. Hoboken fails to convince us that the facts regarding economically

disadvantaged students lead to a conclusion that HoLa should not be permitted to expand.

### III. Funding Impact

Hoboken next argues that the Commissioner's decision was arbitrary and capricious because he failed to consider its January 30, 2015, submission to the court and Hoboken Superintendent Mark Toback's December 13, 2010 letter concerning the funding impact that charter schools had on Hoboken's budget, including the number of special needs students enrolled in HoLa versus Hoboken.

N.J.S.A. 18A:36A-12(b) provides:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil and the prebudget year general fund tax levy per pupil inflated by the CPI rate most recent to the calculation. In addition, the school district of residence shall pay directly to the charter school the security categorical aid attributable to the student and a percentage of the district's special education categorical aid equal to the percentage of the district's special education students enrolled in the charter school, and, if applicable, 100% of preschool education aid. The district of residence shall also pay directly to the charter school any federal funds attributable to the student.

Toback pointed out that the allocation of funds to the charter schools located in Hoboken had "nearly tripled in only a few short years" and that the pattern was not sustainable "given our

18

enrollment increase at the lower grade levels coupled with a 2% tax cap." He claimed that "[e]ven with tax increases, the district must make cuts to services and programs for our students to support charter expansion." He wrote: "We have four school district leaders in one square mile, four business administrators, four separate payrolls, four separate boards of education and a host of required services that are duplicated." However, he did not submit specific financial data to support those assertions.

As to students with special needs, Toback wrote:

> HoLa does enroll a few special needs children, and the other two charters enroll about the same percentage of special needs students as our district. But it must be noted that the charter schools do not enroll students with significant disabilities. It is the public district that enrolls the most significantly disabled children and pays for private out-of-district placements. This concentrates an expensive undertaking in the public schools, thus raising our per-pupil costs and reducing per-pupil costs in charter schools.

He further noted, again without district-specific evidence, that the existing law gave an "incentive" for charter schools to place special needs students in out-of-district placements, which put the cost back on the district.

> [I]f the local school district "demonstrates with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized by [the district's] loss" of the funds to be allocated to a charter school, "the Commissioner is obligated to evaluate carefully the impact

19

that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education."

[In re Proposed Quest Acad., supra, 216 N.J. at 377-78 (quoting Englewood, supra, 164 N.J. at 334-35).]

"[U]nsubstantiated, generalized protests" are insufficient. Englewood, supra, 164 N.J. at 336. "Renewal of a successful charter school will be favored, 'unless reliable information is put forward to demonstrate that a constitutional violation may occur.'" In re Red Bank Charter Sch., supra, 367 N.J. at 482-83 (quoting Englewood, supra, 164 N.J. at 336).

"[T]he Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met." Englewood, supra, 164 N.J. at 334. The district "must be able to support its assertions" as the Commissioner does not have "the burden of canvassing the financial condition of the district of residence in order to determine its ability to adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests." Id. at 336.

In In re Red Bank Charter Sch., supra, 367 N.J. Super. at 482, the district claimed that the funding of a charter school would cause the district's budget to be reduced by $720,000, and that it would cause the elimination of four positions, resulting

20

in bigger classes, as well as the elimination of courtesy busing and reduction of hall monitors, instructional assistants, and cafeteria monitors. In spite of these representations, we found the "paucity of specificity" in the district's claim to be "fatal." Id. at 483.

Here, Hoboken does not argue that the financial losses surrounding HoLa's expansion would impede Hoboken's ability to provide a thorough and efficient education. It mounts only general, non-specific and unconvincing attacks on the entire charter school scheme and does not separate HoLa's impact from the impact of the other two charter schools.

## IV. Fact-gathering

In its supplemental submission to the Commissioner after remand, Hoboken requested that the Commissioner "conduct further interviews, fact gathering, and perhaps hold a hearing to better assess possible interventions." On appeal, Hoboken argues that the Commissioner should have held hearings to consider the effect HoLa's policies and practices had on segregation before reaching a decision as to HoLa's renewal and expansion application.

An adjudicatory hearing is not required in every contested renewal application case. In re Proposed Quest Acad., supra, 216 N.J. at 383. Hoboken raised the issues of HoLa's sibling preference, recruiting practices, fundraising practices, opt-in

21

practice, and request for a low-income preference in its submissions to the Commissioner. Hoboken fails to state, however, what additional information was needed in order for the Commissioner to complete his review. The decision states: "[a]ll submitted materials from both parties were thoroughly reviewed." "When the Commissioner is not acting in a quasi-judicial capacity, as he was not here, he need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as mod., 164 N.J. 316 (2000).

HoLa provides quality education to a cross section of Hoboken's children. As a dual-language school, HoLa allows students to become bilingual in a curriculum with a multi-cultural content, and thus advances public policy goals. Hoboken has not shown that the Commissioner's decision to allow HoLa to expand was arbitrary, capricious, or unreasonable.[2]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] This decision does not preclude parents who believe their child was unfairly denied admission to HoLa for discriminatory reasons from registering an individual complaint pursuant to N.J.S.A. 18A:36A-15.

A-3690-14T3